1  Gloria Juarez, Cal. State Bar No. 109115
   **LAW OFFICES OF GLORIA JUAREZ**
2  28202 Cabot Road, Suite 300
   Laguna Niguel, CA 92677
3  Tel: 949-288-3402
   Email: gloria@thegjlaw.com
4  ATTORNEYS FOR PLAINTIFF THE ESTATE OF BIBI AHMAD
5

6

7                      UNITED STATES DISTRICT COURT
                       CENTRAL  DISTRICT OF CALIFORNIA
8

9

10 The Estate Of Bibi Ahmad, individually, and    | **Case No.  8:23-cv-02303**
   on behalf of all others similarly situated,
11                                                 | **CLASS ACTON COMPLAINT**
12               Plaintiff,                         | **FOR DAMAGES AND CIVIL PENALTIES**
13
              v.                                   | 1. **VIOLATION OF THE FALSE**
14                                                 |    **ADVERTISING LAW,  CAL. BUS. AND**
                                                   |    **PROFESSIONS CODE § 17500 ET SEQ.**
15 UnitedHealth Group Inc., United Healthcare
   Inc., and DOES 1-50 inclusive,                 | 2. **VIOLATION OF THE UNFAIR**
16                                                 |    **COMPETITION LAW,  CAL. BUS. AND**
                                                   |    **PROFESSIONS CODE §17200 ET SEQ.**
17               Defendants.
18                                                 | 3. **VIOLATION OF THE CONSUMERS**
                                                   |    **LEGAL REMEDIES ACT, CAL. CIV.**
19                                                 |    **CODE § 1750 ET SEQ.**
20
                                                   | 4. **NEGLIGENT MISREPRESENTATION**
21
                                                   | 5. **INTENTIONAL**
22                                                 |    **MISREPRESENTATION**
23
                                                   | 6. **UNJUST ENRICHMENT**
24
                                                   | 7. **BREACH OF EXPRESS WARRANTY**
25
                                                   | 8. **INJUNCTIVE RELIEF**
26

27

28                                                 | **DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................4

FACTUAL BACKGROUND ..............................................................................6

UNITED'S MISLEADING MEDICARE ADVANTGE ADVERTISEMENTS............................10

    IMPACT ON MEDICARE BENEFICIARIES AND HEALTHCARE SYSTEM ......................13

PARTIES .................................................................................................16

JURISDICTION AND VENUE .......................................................................17

CLASS ALLEGATIONS ................................................................................18

FACTUAL ALLEGATIONS COMMON TO ALL COUNTS ..........................................20

    MEDICARE ............................................................................................20

    DUAL ELIGIBLES "MEDI-MEDI" .................................................................23

    MEDICARE ADVANTAGE .........................................................................24

    UNITEDHEALTHCARE .............................................................................25

    GOVERNMENT REPORTING OF DECEPTIVE MEDICARE ADVANTAGE ADVERTISING26

    UNITED'S DECEPTIVE ADVERTISING AND INDUCEMENT ................................29

    UNITED'S AGGRESSIVE MEDICARE ADVANTAGE ENROLLMENT TACTICS ARE
    INCENTIVIZED BY OVERSIZED AGENT COMMISSIONS ......................................34

    UNITED'S OBSTRUCTIONIST MEDICARE ADVANTAGE CLAIMS PROCESSING
    MATERIALLY PREJUDICE MEMBERS ...........................................................35

    UNITED ADMITS TO MEDICARE ADVANTAGE UPCODING AND RETAINING
    GOVERNMENT OVERPAYMENTS .................................................................37

    UNITED MEDICARE ADVANTAGE MEMBERS ARE MISLED BY  SURREPTITIOUS
    ENROLLMENTS AND DISENROLLMENTS ......................................................38

        A.   Patient 1: B.A. ...........................................................................38

        B.   Patient 2:  S.J. ...........................................................................40

        C.   Patient 3:  D.D. ..........................................................................42

D.   Patient 4: J.S............................................................................................43

E.   Patient 5: G.L.............................................................................................44

COUNT I ...........................................................................................................44
    VIOLATION OF THE FALSE ADVERTISING LAW (FAL) (CAL. BUS. AND
PROFESSIONS CODE § 17500 ET SEQ.)

COUNT II ..........................................................................................................47
    UNFAIR COMPETITION BY VIOLATION OF SECTION 17200 OF THE
CALIFORNIA BUSINESS AND PROFESSIONS CODE (UCL)

COUNT III...........................................................................................................51
    VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT, CIV. CODE, §
1750 ET SEQ. (CLRA)

COUNT IV ..........................................................................................................52
    NEGLIGENT MISREPRESENTATION

COUNT V.............................................................................................................54
    INTENTIONAL MISREPRESENTATION

COUNT VI ..........................................................................................................56
    UNJUST ENRICHMENT

COUNT VII..........................................................................................................57
    BREACH OF EXPRESS WARRANTY

REQUEST FOR INJUNCTIVE AND DECLARATORY RELIEF ............................................59

PRAYER ................................................................................................................60

1

## CLASS ACTION COMPLAINT

2        Plaintiff, the Estate of Bibi Ahmad ("Plaintiff"), individually and on behalf of all others

3    similarly situated (the "Class Members" or "Class"), by and through her attorneys, brings this

4    class action against Defendants UnitedHealth Group, Inc., United Healthcare, Inc., and Does

5    1-50, inclusive (collectively, "Defendants" or "United") and alleges as follows:

6

7

## PRELIMINARY STATEMENT

8        1.     This putative class action arises from the misleading Medicare Advantage ("MA")

9    advertising practices of United Healthcare and UnitedHealth Group (collectively "United"),

10    the nation's largest provider of for-profit MA plans. This suit is grounded in a pressing and

11    systemic issue because United's ongoing deceptive practices are not merely incidental, they are

12    central to its strategy of diverting vulnerable beneficiaries out of the government-

13    funded Original Medicare ("OM") and Medicaid programs into United's own overly

14    profitable, commercially driven MA plans.

15        2.     At the heart of United's scheme are its own starkly contrasted representations.

16    United's official Medicare Advantage information website truthfully states that "...*Medicare*

17    *Advantage replaces* [Original Medicare]," yet its widespread, direct to consumer advertisements,

18    emails, and communications misleadingly assert otherwise– that its MA plans "*combine the*

19    *benefits of Original Medicare (Parts A and B) with additional benefits*..." and that their MA

20    plans include "*all the benefits of Medicare.*"

21        3.     United's inaccurate advertisements that its MA members are not giving up their

22    OM benefits but are "adding to them", and that MA is a "fallback" plan– are not isolated

23    incidents, or puffery, but a deliberate and pervasive tactic inducing MA enrollment

24    spanning multiple years. Consumers who are misled into enrolling into MA would be

25    required to forfeit their OM card completely, meaning that they are no longer able to receive

26    any benefits of OM. However, United expressly advertises MA as an enhancement to OM

27    ("*get all the benefits of Original Medicare, plus valuable extras*") where, in reality,

28    consumers that were misled into enrolling have lost OM and its benefits.

        4.     United's conscious non-disclosure of material facts to their MA enrollees of their

highly restricted and shrinking MA network of participating hospitals and providers, limited geographic area of services, substantially restricted skilled nursing facility services, restricted specialist access, prior authorization requirements and known improper denials[1], pre-payment medical record reviews, and high rate of improper payment denials are core to its oversized MA member enrollment.    As a result, United MA members incorrectly present and use their government issued OM cards for services, which are ultimately denied by OM *and* United– and payment becomes the full responsibility of the beneficiary to bear out-of-pocket.

5.    The impact of United's practices is profound and far-reaching. United's misleading marketing has led to significant and sustained unfair growth in its MA enrollment, exploiting the trust of a demographic that is most often elderly, disabled, and financially constrained. This vulnerable demographic relies heavily on clear and accurate information to make informed healthcare and financial decisions at a critical time in their life.  The discrepancy in United's messaging has materially contributed to a widespread misunderstanding about the nature of MA plans, leading beneficiaries to unknowingly forfeit their OM coverage, without ever being advised or understanding that they have done so.

6.    United's deliberately misleading MA strategy has been alarmingly effective. Dominating the MA market, United now insures a full third of all MA beneficiaries in the U.S., and a fifth of its health insurance customers are under MA plans. United's MA plans are 200% as profitable as its other plans, and have the added benefit of being funded entirely by taxpayer dollars as guaranteed monthly government capitated payments which are paid regardless of whether United fails to pay out any benefits for its MA members.  United's MA growth has been fueled by aggressive marketing tactics that prioritize profitability over transparency, always at the expense of the most vulnerable.

7.    The consequences of United's actions are not just individual but systemic. As United's inaccurate advertisements and aggressive marketing  and sales tactics proliferate, so too do the number of seniors misled about their healthcare options. The escalation of United's deceptive MA advertising practices has led to a full doubling of consumer complaints and

---

[1] *See* Office of Inspector General April 2022 report, https://oig.hhs.gov/oei/reports/OEI-09-18-00260.pdf ( Last accessed on 12/1/2023.)

concerns, not only from the affected seniors but also from regulatory bodies such as Congress and the Center for Medicare and Medicaid Services ("CMS")[2].

8.      In sum, the damages arise from systematic and egregious misconduct by United in the administration of its MA plan. United has engaged in a pattern of overbilling the Medicare Trust, misrepresenting the health status of its members (to appear sicker than they are) to secure inflated government reimbursements. Simultaneously, United underpays healthcare providers with rates significantly lower than the standard Medicare fees and denies beneficiaries access to necessary medical care through various deceptive schemes. Moreover, United has contested government legal efforts to regulate these practices, retaining upcoded overpayments it admits were not rightfully obtained.

9.      This lawsuit seeks to hold United accountable for its actions, which stand in clear violation of the California False Advertising Law (Business and Professions Code § 17500 et seq.), the Unfair Competition Law (Business and Professions Code § 17200 et seq.), the Consumers Legal Remedies Act (Civil Code § 1750 et seq.), as well as federal statutes including the Federal Trade Commission Act (15 U.S.C. §45) and Lanham Act (15 U.S.C. § 1125). These laws were enacted to protect consumers from precisely the kind of deceptive and unfair practices that United has systematically employed in its successful pursuit of becoming the largest MA insurer and recipient of taxpayer dollars.

## FACTUAL BACKGROUND

10.      In direct contradiction to its own official Medicare information website, United has engaged in widespread dissemination of inaccurate advertisements and a barrage of unsolicited emails to vulnerable Medicare beneficiaries falsely stating that "A Medicare Advantage plan from UnitedHealthcare *combines the benefits of Original Medicare (Parts A and B) with additional benefits…*" This misrepresentation starkly contrasts with the United website's accurate representation that "Medigap adds to Original Medicare while *Medicare Advantage replaces it*."

---

[2] https://www.healthcarefinancenews.com/news/cms-cracks-down-misleading-medicare-advantage-marketing

11.     United's inaccurate MA advertisements include:

a)  Conscious nondisclosure of restricted provider networks, provider non-participation in MA plans, prior authorization requirements for care, limited reimbursements, restricted skilled nursing facility benefits, co-pays, premiums and other features;

b)  Inappropriate or confusing marketing practices leading beneficiaries to enroll in MA plans without adequately understanding the coverage into which they were enrolling. (i.e., beneficiaries believed they were signing up for a Medicare Supplement (Medigap) Plan or Medicare Drug Plan (DP), rather than an MA plan, and they did not understand they were being disenrolled from OM;

c)  Fraudulent activity, including beneficiaries who were enrolled in MA without any contact with a sales agent, or after only inquiring about the plan, forged signatures, misrepresentations by agents and producers, or improper use of personal information;

d)  Aggressive sales practices such as cross-selling, whereby agents used access to beneficiaries (afforded under the Medicare Modernization Act, which allows producers to discuss additional coverage options such as Prescription Drug Plans, but instead has led to pressuring beneficiaries into MA insurance products; and

e)  Improper enrollment into MA plans of individuals with Alzheimer's disease or advanced dementia, mentally incapacitated individuals, or beneficiaries with limited English proficiency, as well as unsuitable enrollment of dual-eligible beneficiaries.

12.     United's misleading communications have played a pivotal role in its strategy to improperly disenroll beneficiaries out of  OM and into United's more lucrative for-profit MA plans. The intentional misrepresentation of the nature of MA plans has led Plaintiff and Class Members to make misinformed decisions about their healthcare coverage.

13.     Some of the experiences that Plaintiff and Class Members have had would be considered fraud by federal authorities, such as a United MA marketer asking for a beneficiary's Medicare or Social Security number before offering plan details or calls advertising time-limited special discounts and 'free groceries. ' United's urgent captioned ads, many with oversized

countdown clocks showing hours and seconds– call for immediacy– falsely inferring that "penalties" or loss of OM benefits would result by not responding to United's MA ads. Further, there are well-known patterns of overly aggressive, deceptive and abusive marketing and sales practices in the MA plan marketplace[3].

14.     The material discrepancy in United's messaging is strategically designed to conceal the fact that enrollment in a MA plan explicitly results in disenrollment from OM.  This deceptive tactic has been central to United's efforts to increase its MA enrollment and market share by having beneficiaries incorrectly present their invalid OM card for services at OM providers, thereby ratifying United foregoing its financial responsibilities to pay for these rendered medical services.

15.     The scope and impact of United's misleading advertising campaigns have become so significant that they have prompted legislative attention. A number of governmental divisions and agencies,  including Congress, the Centers for Medicare and Medicaid Services ("CMS"), and the National Association of Insurance Commissioners have taken steps to address this abuse, particularly as it exploits vulnerable senior populations. *See* **Exhibit D**

16.     United's MA market dominance is unprecedented. In 2023, the average Medicare beneficiary had access to 43 MA plans, the highest number ever. Despite this, United has secured the largest share of MA enrollment, growing from 20 percent in 2010 to 29 percent in 2023[4]. This growth equates to United alone accounting for 8.9 million of the total 30.9 million MA enrollees.

17.     United's core strategy focuses on the profitability of MA plans, which are 200% as profitable than its non-government-funded commercial plans. Of the 50 million Americans insured by United, a full fifth are now enrolled in these taxpayer-funded, privatized for-profit MA plans.

18.     Driven by the discovery that inaccurate marketing leads to higher MA

---

[3] https://www.kff.org/report-section/how-health-insurers-and-brokers-are-marketing-medicare-report

[4] Medicare Advantage in 2023: Enrollment Update and Key Trends | KFF
https://www.kff.org/medicare/issue-brief/medicare-advantage-in-2023-enrollment-update-and-key-trends/ (Last accessed 11/18/2023)

conversions, United has shifted its focus and resources from commercial plans to aggressively marketing its MA plans. This shift has involved tactics that pressure OM beneficiaries to switch to United's much more restricted MA plans, characterized by the limitations and improper denials outlined above. As a result, MA beneficiaries are denied services, and otherwise incur substantial out-of-pocket costs for services which would have been fully covered by OM.

19.     United's MA marketing tactics deliberately target highly vulnerable populations, including the elderly, disabled, and those on fixed or marginal incomes. In particular, United targets the 12 million dual eligible "Medicare-Medicaid" beneficiaries with promises of rebates, meals, free groceries,  and other benefits– which are often not even offered in their geographic area, because they are the most financially constrained. United's enrollment numbers have consistently outpaced other firms, with over 1 million new MA beneficiaries added between March 2022 and March 2023.

20.     In the first quarter of 2023 alone, United added 655,000 new MA members, largely due to these predatory advertising practices. As documented in the Appendix (25 unsolicited United emails sent to a single OM beneficiary from November 2022 to November 2023), United's success in MA enrollments can be substantially attributed to these misleading advertising strategies.

21.     United's advertising falsely suggests that its MA Plans are additions to, rather than replacements for, OM. These advertisements make unwarranted and overly broad claims about the superiority of these plans and fail to mention the known restrictions  of MA coverage. United and its agents  fully misstate their  MA plan is a "fallback" plan and  only supplement, but do not replace OM. They opt for these knowingly inaccurate statements in order to induce enrollment into their MA plans, and suppress more accurate statements that the MA plan fully replaces and extinguishes OM, which would result in substantially lower profits and decreased market share.

22.     Furthermore, United's MA advertisements often create a false sense of urgency and sheer panic among seniors, suggesting that they might miss out on financial savings or benefits, and incur "penalties" if they do not enroll in United's  MA plan. This tactic can leave beneficiaries under the impression that they have incomplete coverage with OM and are entitled to extra benefits under MA.

23.     United's practices are ongoing despite significantly rising senior complaints about these deceptive MA marketing practices. Such complaints, which numbered fewer than 16,000 in 2020, increased to nearly 40,000 in the first eleven months of 2021, according to CMS.

24.     The culmination United's misconduct represents a clear violation of key legal statutes including the California False Advertising Law, the Unfair Competition Law, the Consumers Legal Remedies Act, the Federal Trade Commission Act, and the Lanham Act–which are collectively a bar to such false advertising and unfair business practices.

### UNITED'S MISLEADING MEDICARE ADVANTAGE ADVERTISEMENTS

25.     Plaintiff and Class Members challenge United's systematic misleading of Medicare beneficiaries, particularly targeting vulnerable seniors, by portraying its Medicare Advantage ("MA") plans as  an enhancement to Original Medicare ("OM") as well as its MA plans combining with OM, not a replacement. United explicitly advertises that its MA plan gives "**all the benefits of Original Medicare plus extra valuables**" and that it "**combines"** and gives  "**more benefits that Medicare",** however, United's  MA plan fully replaces and extinguishes any OM benefits. In other words, the MA members no longer have OM from the government, and have instead a commercial plan from a for profit commercial carrier- United. United further inaccurately represents itself as a "Medicare Plan Expert" in countless advertisements and emails, which incorrectly states its expertise is 'Medicare', not its for -profit Medicare Advantage plan- hence misleading OM beneficiaries into believing they are relying on statements and discussions with either Medicare directly, or at a minimum an objective and unbiased OM plan expert.

26.     United's inaccurate advertising strategy is built on the false premise that MA plans are *an addition* rather than a replacement to OM, leading beneficiaries to enroll under knowingly incorrect assumptions. This key deception is exemplified by United's consistent use of the term *"combined"* in their marketing materials as well as their sales agents, suggesting an addition of benefits, while in reality, enrollment in MA necessitates the forfeiture of government OM benefits. MA is a commercial insurance product whereas OM is a federal government product.

27.      Furthermore, United misleadingly represents that MA plans are "better" than

OM, despite substantial MA restrictions, such as the need for prior authorizations, pre-payment medical records review, restricted networks and providers, substantially lower provider reimbursement rates, substantially reduced skilled nursing facility benefits, higher out-of-pocket costs, high rates of denied services, and limited geographic coverage, all of which starkly contrast with the unrestricted OM nationwide coverage and access to any doctor, any hospital, and any specialist– without need for the MA required prior authorizations or post service and pre-payment medical record reviews[5].  While some beneficiaries or employers make a choice to enroll in MA plans, these are typically a known trade of  less choice and restricted  benefits for financial savings, not a "superior" insurance product. To the contrary, when patients are actually sick, they overwhelmingly disenroll from MA and back into OM– with substantial hardship including new underwriting for their Medicare Supplemental plans.  That is because OM is widely held by patients and providers as the premium and top health insurance plan as compared to nearly all other commercial plans.

28.     It is widely held that "*Medicare Advantage is neither Medicare nor an advantage.*" MA is a commercial alternative to government provided OM. Much like private prisons, it is privately run but taxpayer funded through the Medicare trust. Further, it is not an "advantage" as it relinquishes invaluable freedom of choice, freedom of providers, and freedom of medical services in exchange for a complex labyrinth of "Medicare Dis-advantage" delay and denial tactics.   Many beneficiaries do not realize that MA is privatized for-profit option to OM and it is not an added enhancement, but a frank relinquishing of the entirety of the government benefits entitled and provided under OM.

29.     Of the roughly 65 million Americans eligible and enrolled in the Medicare program, approximately 50% are enrolled in MA plans with substantial restrictions in terms of services, providers, and subject to each commercial carrier's "medical necessity" policies. For many retired or disabled people who are living on Social Security, the OM premiums for Part B doctor visits ($174.70 per month) and Part D prescription drug coverage ($55.50 per month) are significant. They are drawn into MA because it is perceived to be cheaper, not because it is

---

[5] United unveils policy to retroactively deny patient ED claims, Modem Healthcare (Jun. 4, 2021), https://www.modemhealthcare.com/payment/united-unveils-policy- retroactively-deny-patient-ed-claims.

better or superior to OM.

30.     Of the 35 million Medicare beneficiaries enrolled in MA programs, more than a third are enrolled in United MA plans through the described aggressive and inaccurate advertising campaigns intended to cause beneficiaries to believe there to be a sense of urgency and panic in disenrolling from OM and signing up for the next year's United MA plan. United achieves this false urgency through a barrage of emails featuring an oversized count down "doomsday clock. " *See* Appendix.

31.     United has systematically and knowingly, misled beneficiaries, especially the marginalized OM beneficiaries by portraying its MA plans as combined with OM, and also as equivalent or superior to OM This fundamental misrepresentation violates truthful advertising principles and breaches trust. United's advertising is designed to mislead OM beneficiaries into enrolling in United's MA Plans under the false premise that the MA Plan will be "combined" with their OM plan. United erroneously portrays MA as an additional plan and a "fallback" plan, rather than a replacement which they are.

32.     The patently inaccurate claim that United MA plans are "combined" with OM is also misleading, leading beneficiaries to believe they will retain OM benefits while gaining additional MA benefits, which is not the case. United broadly misrepresents that MA plans are "better" than OM, despite MA plans having substantial material restrictions. Some United MA ads suggest that people with OM miss out on benefits to which they are entitled if they are not enrolled in a MA plan.

33.     United MA sales agents are also cashing in for oversized commissions per enrolled MA beneficiary by taking advantage of loopholes and loosened rules around marketing and enrollment to beneficiaries– often badgering seniors on the phone, confusing them on television, and inundating them with mountains of mail and email. An increasing number of MA marketing materials are fraudulent or deceptive, undermining beneficiary access to care and trust in the Medicare program. Of particular concern are reports of vulnerable seniors' and people with disabilities' health plans without their consent.

34.     Contrasting coverage and costs between OM and MA plans, United ads do not mention OM, and also fail to disclose the difficulties in disenrolling from MA plans and reenrolling in OM with new Medigap underwriting, and the known limitations imposed by MA

plans compared to the very broad-ranging and unrestricted coverage of OM.

### IMPACT ON MEDICARE BENEFICIARIES AND HEALTHCARE SYSTEM

35.     United's deceptive MA business practices, characterized by systemically repeatedly denying valid claims and manipulating patient data and diagnosis, have led to unpaid medical bills for MA enrollees and undue burdens on these beneficiaries. Their misleading claim that beneficiaries retain OM coverage in addition to MA plans has caused confusion and financial liabilities when care is sought from non-MA providers. This confusion is exacerbated during peak enrollment periods, where seniors are bombarded with unsolicited invitations lacking full disclosure of the implications of switching from OM to MA. United's additional  practice of unauthorized enrollments and the aggressive sales tactics incentivized by oversized agent commissions further demonstrate United's unethical enrollment practices. *See* **Exhibit A .**

36.     United's deceptive practices burden MA enrollees with unpaid medical bills, and as a direct result not only impacts the individual MA patients but also strain the broader healthcare system, which must navigate these unpaid bills and denied claims.

37.     The lack of stringent oversight within United's MA enrollment practices is further evidenced by the minimal disciplinary action taken against producers and sales agents even when they are alleged to have forged MA enrollment forms. This indicates a broader issue of lax oversight and accountability in United's operations. Additionally, United has been accused of underreporting complaints to CMS, which skews benchmarks for bonuses[6] and creates a misleadingly positive picture of consumer satisfaction. Despite the increasing number of complaints, United continues to enroll new members in their MA plans, relying heavily on misleading advertising. This continued practice highlights a persistent issue in their approach to MA enrollment and  advertising, raising questions about the ethical standards and consumer protection within their operations.

38.     United's administrative practices, including the use of faulty algorithms and

---

[6] United — the biggest MA payer in the U.S. — received $2.8 billion of the total $10 billion in MA bonuses for 2022. https://www.healthcaredive.com/news/cvs-income-hit-ma-star-ratings-drop/651408/

artificial intelligence, often lead to the denial of rightful MA claims, undermining the integrity of the claims process and reducing operational costs at the expense of beneficiaries. Moreover, United's reported administrative costs for managing MA benefits are tenfold higher than those for OM, indicating a misaligned focus on profit over patient care–earmarking taxpayer dollars for a complex system of administrative claim delays and denials, which should otherwise go toward legitimate payment of medical care. The company's systematic approach to misleading beneficiaries, particularly through campaigns that create panic and confusion, has eroded the trust in the Medicare program and contributed to an increase in predatory and deceptive marketing complaints. By targeting vulnerable populations, including those with cognitive impairments and dual eligibilities, United has engaged in practices that not only violate advertising statutes but also fundamentally undermine the principles of patient-centered healthcare.

39.     United's practices have also led to a growing reluctance among hospitals and doctors to accept MA patients, primarily due to United's known business scheme of unfair claims processing and frequent denials. This is compounded by United's failure to acknowledge the rejection of their MA plans by many healthcare systems, impairing beneficiaries' access to specialized care. As a result of United's inaccurate MA plan advertising and deceptive enrollment, there has been a systematic ripple cripple effect across the healthcare system, decimating both community hospitals, providers, and beneficiaries. Doctors and hospitals are increasingly showing reluctance to accept United MA patients, primarily due to United's unfair claims processing, frequent denials, and a convoluted and unbalanced appeals process. This reluctance is further compounded by United's refusal to acknowledge the rejection of their MA plans by many clinics and hospital systems, leading to impaired access for beneficiaries to specialized care.

40.     A crucial aspect of United's MA strategy involves exploiting the high rate of improper claim denials[7] and low rate of claim appeals. United's exploitation is with the

---

[7] An April 2022 U.S. Department of Health and Human Services government report determined that eighteen percent  (18%) of United MA payment denials were improper–for claims that met Medicare coverage rules and

understanding that many beneficiaries struggle with the complex, labor intensive, and unfavorable appeals process. This allows United to avoid paying for prescribed care, leading to financial gains at the expense of beneficiaries who often must forgo necessary treatments or deplete personal savings to cover medical expenses. *See* Patients 2,3, and 5.

41.     United's decade-long campaign of deceptive advertising, promoting the benefits of MA plans over traditional OM, has been a key driver of their profits, often at the detriment of beneficiaries, the government, and the healthcare providers. United's predatory conduct has misled millions of individuals, denying them a true understanding of the consequences of relinquishing OM benefits for the more limited MA plans.

42.     United benefitted financially from its misconduct in at least five ways. <u>First,</u> United avoided paying benefits out of its own funds for medically necessary care provided to its MA beneficiaries out of its network.. <u>Second,</u> United continued charging the government and receiving the monthly capitated[8] payment per beneficiary, while improperly denying valid claims for services rendered using the OM government issued card. <u>Third,</u> United benefited by gaining healthier MA members through the services which they received with false presentation of their OM government issued cards. <u>Fourth,</u> United delayed and denied even valid in-network MA claims, and after exhaustive appeals would pay on a fraction of claims and at a fraction of the OM approved rates.   <u>Fifth,</u> United scours the medical records it demands through the appeals process for these beneficiaries to submit additional diagnosis data to the government for bonus

---

Medicare Advantage  Organizations (MAO) billing rules for medical services that providers had already delivered to MA members.

In the same report, it was found that thirteen percent (13%) of MA prior authorization denials were improper–for service requests that met Medicare coverage rules, likely preventing or delaying medically necessary care for MA Beneficiaries. See https://oig.hhs.gov/oei/reports/OEI-09-18-00260.pdf ( Last accessed on 12/1/2023.)

[8] In the MA capitated payment model, United receives a fixed amount of money per patient from the government regardless of the number of services provided to the patient. According to the Office of inspector General's April 2022 report, the "central concern about the capitated MA payment model is the potential incentive for Medicare Advantage  Organizations (MAOs) to deny beneficiary access to services and deny payments to providers in an attempt to increase profits." United issues millions of denials each year, and CMS's annual audits of MAOs have highlighted  widespread and persistent problems related to inappropriate denials of services and payment. See https://oig.hhs.gov/oei/reports/OEI-09-18-00260.pdf ( Last accessed on 12/1/2023.)

payments while concurrently misrepresenting to the government that the beneficiaries were "sicker" than they actually were. These practices warrant heightened scrutiny due to the inherent conflicts of interest in United's inaccurate MA advertising.

43.     Given the nature of United's conduct, it would be inequitable to permit United to retain these benefits derived from these systemic practices. Thus, Plaintiff and the Class are entitled to appropriate equitable relief, which should include  but is not limited to, an appropriate  monetary award based on disgorgement of unjust profits, restitution for losses incurred, surcharges, and other remedies as may be deemed just and equitable under the circumstances.

**PARTIES**

44.     Plaintiff Bibi Ahmad, now deceased, represented by the Estate of Bibi Ahmad, was at all times relevant to this action a citizen of California, residing in Orange County.

45.     Defendant **UnitedHealth Group, Inc.** ("UnitedHealth Group" or "UHG")  is a publicly held Delaware corporation, headquartered at 9800 Health Care Lane, Minnetonka, Minnesota 55343. UnitedHealth Group conducts insurance operations nationwide, representing to consumers that UnitedHealth Group and its subsidiaries including **United HealthCare Insurance Company, United HealthCare Services, Inc., and UnitedHealthcare Service LLC**, represent their commitment to "help people live healthier lives and help make the health system work better for everyone." UnitedHealth Group markets and issues health insurance and insures, issues, administers, and makes coverage and benefit determinations related to the health care policies nationally through its various wholly owned and controlled subsidiaries, controlled agents and undisclosed principals and agents, including Defendant UnitedHealthcare, Inc. Defendant UnitedHealth Group is licensed and registered to conduct and does conduct business in all 50 states and Puerto Rico and Guam, and is thereby subject to these laws.

46.     Defendant **United Healthcare, Inc.** ("United Healthcare") incorporated in Delaware, is a wholly owned subsidiary of Defendant UnitedHealth Group, Inc., with its principal place of business at 9800 Health Care Ln, Minnetonka, Minnesota 55343. United Healthcare markets and issues health insurance and insures, issues, administers, and renders coverage and benefit determinations related to the health care policies. Defendant United

Healthcare is licensed and registered to conduct business in all 50 states, and does conduct business in all 50 states and Puerto Rico and Guam, and is thereby subject to the laws and regulations of all states and territories.

47.    Defendants are referred to collectively in this Complaint as "United."

48.    Plaintiff also sues fictitiously named Defendants Does 1 through 50, inclusive, pursuant to Section 474 of the California Civil Procedure, because their precise names, capacities, roles, or liabilities are presently known. These Does are believed to be individuals, firms, corporations, associations, or entities that have contributed to, participated in, approved of, or ratified the wrongful acts and practices set forth herein. Plaintiff is informed and believes, and based upon alleges, that each of the fictitiously named Defendants are responsible in some manner for the unlawful conduct alleged herein. Plaintiff will seek to amend this complaint to include these Defendants' true names and capacities, together with appropriate charging language, when such information has been ascertained.

49.

50.    JURISDICTION AND VENUE

51.    This Court has *subject matter jurisdiction* over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d)(2). This is a putative class action in which there is a diversity of citizenship between at least one Plaintiff Class member and one Defendant; the proposed Classes each exceed one hundred members; and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs.

52.    In addition, under 28 U.S.C. §1367, this Court may exercise *supplemental jurisdiction* over the state law claims because all claims are derived from a common nucleus of operative facts and are such that Plaintiff would ordinarily expect to try them in one judicial proceeding.

53.    This Court has *personal jurisdiction* because Defendants although headquartered in Minnesota, have sufficient minimum contacts with California, and otherwise purposefully avail themselves of the benefits and protections of California law, so as to render the exercise of jurisdiction by this Court proper and consistent with traditional notion of fair play and substantial justice.

54.    Venue is proper pursuant to 28 U.S.C. §1391. Defendants regularly conduct

business in this District, and a substantial part of the events giving rise to the claims asserted herein occurred in this District.

## CLASS ALLEGATIONS

55.    Plaintiff(s) bring this action on their own behalf and on behalf of all other persons similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. The Class which Plaintiff(s) seek to represent comprises:

> "All persons who purchased Medicare Advantage Plan health insurance from Defendants in the United States, including the territories of Guam, and Puerto Rico during the period of **four-years** prior to the filing of the complaint through the present."

56.    Said definition may be further defined or amended by additional pleadings, evidentiary hearings, a class certification hearing, and orders of this Court.

57.    This action seeks to address the deceptive marketing and enrollment practices by United in relation to its MA plans. The proposed class includes all individuals who were enrolled in United's MA plans through the practices in question during the preceding four-year period.

58.    Plaintiff asserts that this action is appropriately brought as a class action and intends to move for class certification pursuant to Federal Rules of Civil Procedure Rule 23, or the relevant state procedural rules, at the proper time.

59.    This lawsuit is suitable for class action treatment due to the commonality of legal and factual issues affecting the Plaintiff and the proposed Class Members, particularly regarding United's marketing and enrollment strategies. United administers numerous MA plans with deceptive and misleading plan language and marketing practices, materially causing harm to beneficiaries enrolled in these plans.

60.    United frequently enrolled beneficiaries into MA plans without adequately disclosing the limitations and differences compared to OM leading to unexpected denials and limitations in healthcare access for beneficiaries.

61.    As a result, Plaintiff brings claims on behalf of a class defined as all Medicare beneficiaries enrolled in a United MA plan in the prior four-years who experienced diminished

healthcare access or financial harm due to United's deceptive MA enrollment practices.

62.     There was nothing unique about the way United advertised and enrolled the MA beneficiaries. Instead, United engaged in similar conduct with respect to numerous OM beneficiaries who received their health benefits through government funded plans.

63.     The sheer number of individuals in the proposed Class renders the joinder of all members impractical, if not impossible. Given United's status as the nation's largest provider of MA plans, the class is likely comprised of a substantial number of affected beneficiaries. This number and the specific identities of Class Members will be further determined during the discovery process. A class action is not only the most efficient but also the most equitable method to adjudicate these claims. Individual litigation would impose undue financial and logistical burdens on class members, many of whom might lack the resources to prosecute their claims individually.

64.     Common questions of law and fact unite the Class. These include, but are not limited to, inquiries into whether United disseminated unsolicited emails and communications containing deceptive advertisements about their MA plans, misrepresented the nature and scope of these plans compared to OM, and whether such misrepresentations resulted in financial damages or restricted healthcare access for class members. Establishing these commonalities is essential for demonstrating the suitability of this case for class action treatment.

65.     Plaintiff will fairly and adequately protect the interests of the Class, is committed to the vigorous prosecution of this action, has retained competent and experienced counsel in class action and complex litigation, and has no interests antagonistic to or in conflict with those of the Class.

66.     United has engaged in a uniform practice of misleading marketing and enrollment practices, systematically enrolling beneficiaries into MA plans without full disclosure of the limitations and differences from OM, causing widespread confusion and harm.

67.     Plaintiff and the Class have suffered tangible injury and financial loss as a direct result of Defendants' misconduct. Specifically, Plaintiff and Class Members have incurred personal liability for medical and surgical expenses that would have been covered under OM . To substantiate these claims, Plaintiff will present a range of evidence, including but not limited to Medicare and United's explanation of benefits documents, which detail denials and limitations of

coverage. Additionally, statistical data will be utilized to illustrate the broader impact of these practices on the Class. This evidence will collectively demonstrate the extent of financial harm and diminished healthcare access experienced by the Class due to United's deceptive enrollment practices.

68.     The trial and litigation of Plaintiffs' claims are manageable. Individual litigation of the legal and factual issues raised by Defendants' conduct would increase delay and expense to all parties and the court system. The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economics of scale, and comprehensive supervision by a single court.

69.     Defendants have engaged in conduct affecting all Class Members, thus warranting the pursuit of final injunctive relief and/or declaratory relief applicable to the entire Class. Such collective legal action is essential to ensure consistent adjudication across all Class Members, avoiding the potential for disparate rulings that could result in incompatible standards of conduct for Defendants. This uniform approach in addressing Defendants' practices is crucial for maintaining the integrity of the legal process and ensuring equitable treatment for all affected by Defendants' actions.

70.     Absent a class action, Defendants will likely retain the benefits of their wrongdoing. Because of the small size of the individual Class members' claims, few, if any, Class Members could afford to seek legal redress for the wrongs complained of herein. Absent a representative action, the Class will continue to suffer losses and Defendants will be allowed to continue these violations of law and to retain the proceeds of its ill-gotten gains.

71.     As a claims administrator, United maintains detailed records of MA enrollments, plan terms, and beneficiary communications, which can be used to identify Class Members and ascertain the full extent of the impact of its practices. Accordingly, the members of the Class can be readily and objectively ascertained through use of United's records.

### FACTUAL ALLEGATIONS COMMON TO ALL COUNTS
#### MEDICARE

72.     Medicare is a federally operated health insurance program administered by the Centers for Medicare and Medicaid Services ("CMS")  benefiting individuals 65 and older and

people with disabilities. *See* 42 U.S.C. § 1395c et seq. Medicare coverage applies to any U.S. State, District of Columbia, Puerto Rico, U.S. Virgin Islands, Guam, Northern Mariana Islands, and American Samoa. There are 65 million Medicare beneficiaries, eligible by either age or disability.

73.     The well-known, official government-issued red, white, and blue card represents Original Medicare. Once enrolled in OM as a right of age, OM benefits are guaranteed for life. OM automatically continues each year, is not subject to any deadlines or penalties, and is not terminated unless the beneficiary voluntarily disenrolls and opts for an MA or alternate plan.



74.     Medicare Parts A and B are commonly known as "traditional" or "Original" Medicare ("OM"). Part A covers inpatient hospital and institutional care, while Part B covers physician, outpatient, laboratory, radiology, and ancillary services and durable medical equipment. Under Parts A and B, CMS reimburses healthcare providers (e.g., hospitals and physicians' offices) directly using a fee-for-service system.

75.     Specifically, healthcare providers submit claims to CMS for rendered medical services. CMS, in turn, directly pays providers for each service based on payment rates established by it. CMS' prices set the national benchmark for what all other carriers and providers charge for each service, codified by standard national codes. Each commercial carrier

then sets its contracted fees as a percentage[9] of CMS's fee schedule.

76.    CMS has no pre-authorization requirement for any service, no restricted or designated network, no specialist referral requirement, and no restriction or any limitations as to which providers which an OM beneficiary may use. Nearly 99% of U.S. providers and hospitals and clinics are OM providers, hence OM beneficiaries may seek medical care from any specialist and anywhere in the 50 states and U.S. territories.

77.    Under Medicare Part C, which is at issue in this case, Medicare beneficiaries can elect to forego OM Part A and Part B benefits, and instead receive their insurance through a commercial for-profit non-government MA plan such as those offered by the United MA Organizations ("MAO".) *See* 42 U.S.C. §§ 1395w-21 to 1395w-28.

78.    Congress expressly delegated authority to CMS to issue rules to implement and regulate Medicare Part C. *See* 42 U.S.C. § 1395w-26(b). Pursuant to that delegation, CMS has promulgated regulations that, inter alia, define the MA organizations' obligations and responsibilities. *See* generally 42 C.F.R. Part 422.

79.    In addition to issuing regulations, CMS also has defined the MA organizations' obligations contractually. For example, to participate in Medicare Part C, MA organizations must execute a written agreement, or a renewal of the written agreement, with CMS on an annual basis for each of the MA plans they operate. United executed such agreements or renewals annually for all of the MA plans they operated during the relevant period. The material terms and conditions in the Part C annual agreements and renewals remained largely the same.

80.    By executing these contracts, the United agreed to comply with CMS's

---

[9] United is known to reimburse its contracted healthcare providers and hospitals at significantly lower rates than those allowed by CMS, as well as most other commercial carriers for comparable services. In a typical instance, where CMS guidelines set a reimbursement of $100 for a specific healthcare service, United customarily sets its reimbursement for the identical service and coding between $60 to $67.

United's practice results in reimbursements that are approximately 33% lower than what Medicare would allocate for the same healthcare services. This discrepancy in reimbursement rates is indicative of United's cost-containment strategies and unfair payment practices, which substantially impacts both MA beneficiaries and their ability to obtain care from qualified providers and hospitals.

requirements relating to the submission of diagnosis data. Specifically, the contracts require the MA plans to operate "in compliance with the requirements of [] applicable Federal statutes, regulations, and policies," including the "Medicare Managed Care Manual," and would "implement a compliance plan in accordance with [42 C.F.R.] § 422.503(b)(4)(vi)."

81.    Part C regulations require MA organizations to implement compliance procedures and programs and to submit annual attestations concerning the accuracy and truthfulness of the diagnosis data they submit to CMS to receive supplemental or bonus payments for taking care of the "sicker" beneficiaries.

82.    United's MA plan is not "Original Medicare" and is operated and managed entirely by the MAO. United contracts with CMS to receive a fixed capitated monthly payment per MA member which is not conditioned on United ever providing any services or payments for care to its MA member whatsoever.  *See* 42 C.F.R. §§ 422.2, 422.503(b)(2).

83.    Under Part C, CMS no longer administrates any benefits or claims for the MA member, except hospice services.  MA beneficiaries receive restricted medical services from MA contracted providers, such as hospitals and doctors, who must expressly contract with and are directly paid by the MAO. More specifically, when a healthcare provider furnishes medical services to a MA member the provider submits claims and encounter data to the MAO, not CMS. United retains CMS's monthly capitated per MA member payment regardless of whether United ever pays a single claim for the beneficiary.

84.    Once a beneficiary enrolls in a MA plan, CMS will deny any claims received on their behalf, and their government-issued OM card becomes invalid.

### DUAL ELIGIBLES "MEDI-MEDI"

85.    Elderly or disabled beneficiaries with qualifying low incomes are eligible for both Medicare and Medicaid, hence termed "dual-eligibles.[10]" They are not required to pay any premiums or deductibles for Medicare or Medicaid, and they are also typically provided full prescription coverage, as well as dental, vision, and hearing benefits through Medicaid.

86.    Dual eligibles have no restrictions, no required networks, and no prior

---

[10]  Patients 2 and 3 below are two of about 12 million dual eligible people in the U.S. whose medical and social vulnerabilities qualify them for both Medicare and Medicaid.

authorization requirements– they may see any doctors whom they wish to see, in any state (not limited by geography), and may have unlimited diagnostic labs and imaging like CT scans, and MRI's–which any physician orders.

87.     Dual eligibles may change, enroll, or disenroll into alternate plans like MA plan each quarter. Otherwise, open enrollment for all other Medicare beneficiaries — which runs from Oct. 15 to Dec. 7 each  year — allows seniors to choose a new MA plan if they elect.

88.     Dual eligibles have options in the form of special MA plans called Dual-Eligible Special Needs Plans. These offerings may seem to include extra benefits, but can increase confusion. If a dual eligible enrolls in an MA plan, they would receive few if any health or financial  benefits in comparison to OM and Medicaid. An MA  plan would cause them to be restricted in which doctors they could see, which procedures they could have, and also subject them to a broad and confusing labyrinth of prior authorization and denial of services– which they could otherwise have freely had under OM.

## **MEDICARE ADVANTAGE**

89.     The Medicare Advantage ("MA") program originated with the Balanced Budget Act of 1997, which added Part C (section 1851 through 1859) to the Medicare Act. Initially referred to as Medicare + Choice, the program enables most individuals eligible for traditional or Original Medicare (Parts A and B) to receive healthcare benefits through private insurance plans that contract with CMS instead of through the federal government. In 2003, the Medicare Prescription Drug, Improvement, and Modernization Act further amended the Medicare Act, giving the program its current name.

90.     The MA program includes a provision that allows Medicare beneficiaries to enroll in managed health insurance plans that are owned and operated by commercial insurance organizations, called Medicare Advantage Organizations ("MAO").

91.     Under MA, a private insurer contracts with CMS to serve the role of intermediary between the beneficiaries and the healthcare providers in CMS's place. The insurer is responsible for providing at least the same level of benefits that OM offers, and for ensuring that providers are paid for their services.

92.     In return, CMS makes monthly capitated payments to each MAO for each beneficiary enrolled in each of the organizations' MA plans. The government pays the MAO set

("capitated") per-member-per-month payments ("PMPM".) These PMPM capitated payments are pre-determined and fixed before the beginning of each payment year as part of a bidding and contract negotiation process specified by statute. These payments do not depend on the amount or types of services actually provided to the beneficiary during the payment year.

93.    By design and effect, MA plans assume the risk of providing healthcare to their enrollees that CMS would otherwise bear. MA plans agree to make available a predetermined set of benefits in exchange for predetermined compensation from CMS.

94.    Under the MA Program, CMS adjusts these PMPM payments for each beneficiary. These adjustments reflect the predicted cost of insuring each beneficiary, which is referred to as the predicted risk. The predicted risk reflects the beneficiary's age, sex, and other demographic factors and his or her health status. 42 U.S.C. § 1395w-23(a)(1)(C). CMS uses its risk adjustment payment system to adjust the capitated amounts based on the expected risk of insuring each beneficiary.

95.    More specifically, for each beneficiary enrolled in a Part C plan, CMS calculates a risk score—also known as the risk adjustment factor or "RAF"—which acts as a multiplier for purposes of determining the PMPM payment for that beneficiary. See 42 C.F.R. § 422.308(e).2 Beneficiaries who have severe and chronic medical conditions have higher risk scores. Thus, CMS pays MA organizations more for beneficiaries with such medical conditions and less for beneficiaries without those conditions.

96.    Moreover, because the government furnishes MA plans with the same PMPM regardless of their actual expenditures, there is a substantial financial incentive for MAO's like United to delay and deny care and payment for MA beneficiaries.[11]

### UNITEDHEALTHCARE

97.    United is the nation's largest MA Organization (MAO), selling over 50 MA and Drug Prescription plans, heavily funded by taxpayer dollars. While United offers non-government funded health plans to a broad spectrum of individuals and employers, its focus in the past decade has dramatically shifted towards MA plans, which are 200% more profitable

---

[11] See https://oig.hhs.gov/oei/reports/OEI-09-18-00260.pdf (Last accessed on 12/1/2023.)

than traditional commercial insurance offerings.

98.    United's growth in the MA market is striking. From serving one-in-five MA beneficiaries in 2016 to capturing approximately one-third of this market by 2023, United now insures nearly 9 million MA beneficiaries. In 2019, this number was 5,857,700 enrolling members in 56 states and territories[12]. This rapid expansion is not just a reflection of United's market strategy but also indicative of its aggressive and misleading advertising practices that have been central to this MA enrollment growth.

99.    Financially, United has shown remarkable growth, reporting $91.9 billion in revenue for the first quarter of 2023, marking a 15% year-over-year increase. This substantial surge (500% increase in revenues United experienced from 2012 to 2022) is primarily fueled by its government-funded MA plans, which form a significant part of its business model. These financial gains underscore its growing reliance on taxpayer-funded healthcare initiatives and depletion of the Medicare Trust Fund[13].

100.    United's structure as a vertically integrated entity has raised government concerns about its influence over MA healthcare delivery. By controlling a wide range of healthcare services — from medical practices, labs, clinics, hospices, billing clearing houses, to pharmacies and direct employment of 50,000+ physicians — United has significant control over patient care. This vertical integration has impacted United's inaccurate advertising strategies, promotion of its MA plans through a  skewed and incomplete picture of coverage, and contributing to the misleading representation of its MA plans as being an addition to Medicare Parts A and B(rather than a replacement), and superior to OM.

**GOVERNMENT REPORTING OF DECEPTIVE MEDICARE ADVANTAGE ADVERTISING**

101.    In 2022, the National Association of Insurance Commissioners filed a complaint

---

[12] See https://oig.hhs.gov/oei/reports/OEI-09-18-00260.pdf ( Last accessed on 12/1/2023.)

[13] CMS reported that improper *overpayments* to MA plans totaled $11.4 billion in fiscal year 2022, significantly impacting and eroding the Medicare trust fund. The Medicare Payment Advisory Commission, an independent agency that advises Congress about Medicare, estimates that MA  plans collected $124 billion in improper *overpayments* between 2008 and 2023.

with Congress outlining the ongoing MA advertising deception across 14 states[14]. This complaint underscores the systemic nature of the deceptive practices in MA marketing. *See* **Exhibit C**

102.    A   CMS   published   report[15] further fully substantiated these concerns, underscoring that the number of Medicare beneficiary complaints about MA marketing  more than doubled from 2020 to 2021.[16] *See* **Exhibit D.**

103.    The Senate Finance Committee's August 2022 investigation into MA marketing complaints unearthed evidence that OM beneficiaries are being inundated with aggressive and misleading marketing, such as:

    (1) Seniors shopping at their local grocery store are approached by insurance agents and induced to  switch their Medicare coverage to MA plans;

    (2) Insurance agents selling new MA plans inaccurately tell seniors that their doctors are covered by the new plans;

    (3) Seniors who switch plans find out months later that their doctor(s) is/are actually out-of-network, and they have to pay out-of-pocket to visit their doctor(s);

    (4) Seniors receive mailers that look like official business from a Federal agency, yet the mailer is a marketing prompt from an MA plan or its agent or broker;

    (5) An insurance agent calls seniors up to 20 times a day, attempting to induce them to enroll into MA; and

    (6) Widespread television advertisements with celebrities claim that seniors are missing out on  benefits, including higher Social Security payments, in order to prompt seniors to call, MA plan agent or broker hotlines.

104.    These instances are not isolated but part of a broader trend of deceptive marketing, as identified by government investigations. Such tactics include misusing the

---

[14] https://www.kff.org/report-section/how-health-insurers-and-brokers-are-marketing-medicare-report/

[15] https://www.finance.senate.gov/imo/media/doc/Deceptive%20Marketing%20Practices%20Flourish%20in%20Medicare%20Advantage.pdf

[16] " In 2020, CMS  received a total of 15,497 complaints related to marketing. In 2021, excluding December, the total was 39,617."

"Medicare" brand in marketing materials to falsely imply official government endorsement, leading to confusion among beneficiaries. United's practices are intentionally deceptive as they blur the lines between official government communication and private health plan marketing. United's MA emails identity  United as a "Medicare" expert not a MA expert, and advertise a "Right Plan Promise" to determine the best "Medicare plan" for the caller.

105.   The referenced government investigations have revealed various predatory actions by MA agents, including enrolling beneficiaries under false pretenses and altering the health plans of vulnerable seniors and disabled individuals without consent. These actions disproportionately impact the most susceptible groups within the Medicare population, including those with cognitive impairments and dual eligibles.

106.   Government reports, including those from the Government Accountability Office (GAO) have highlighted compliance and enforcement actions against multiple organizations for inappropriate marketing within the MA space. The GAO issued a report on MA marketing finding that "CMS took compliance and enforcement actions for inappropriate marketing against at least 73 organizations that sponsored MA plans[9]."

107.   The Health and Human Services Office of the Inspector General (HHS OIG) examined the marketing of MA plans  found that inappropriate marketing was addressed in part by special election periods (SEP) during which beneficiaries could change their coverage, but that some beneficiaries experienced outcomes that could not be resolved by a SEP, including disruption in care and additional financial costs.

108.   Overall, these government findings and reports paint a concerning picture of the MA marketing landscape, characterized by widespread deceptive practices that exploit the vulnerabilities of Medicare beneficiaries, leading to disrupted care and additional financial burdens for those affected.

109.   The burden of deceptive and predatory marketing practices falls unequally across the already susceptible Medicare population. MA plans unfairly target individuals with cognitive impairments[4] as well as **those dually eligible for Medicare and Medicaid (so-called "dual eligibles" who are allowed to switch plans once every quarter**) by misadvising them that there is urgency to enroll only in a 7-week period in the autumn, between October 15th  and December 7th. As demonstrated in the Appendix, United MA plans and their contractors are

continuing in manipulative and aggressive sales practices that take advantage of vulnerable OM seniors.

### UNITED'S DECEPTIVE ADVERTISING AND INDUCEMENT

110.    United has leveraged marketing strategies designed to deliberately mislead, confuse, and unduly pressure Medicare beneficiaries into enrolling in its MA (MA) plans. One of its main schemes is an onslaught of predatory and urgent captioned emails, creating unnecessary panic, fear,  and urgency among beneficiaries as demonstrated in the Appendix to this complaint.

111.    According to a U.S. Senate Committee on Finance report, such deceptive marketing practices often lead to beneficiaries unknowingly being switched– without their consent– to plans that fail to cover their essential medical needs or preferred providers. The experiences of Patients 1-5 as detailed below, exemplify this pattern of OM beneficiaries being unknowingly enrolled into United MA.

112.    The adverse effects of United's MA plan advertisements extend beyond mere inconvenience; they lead to significant confusion and instability in healthcare coverage for beneficiaries, as evidenced by the spike in complaints, particularly in early months of the year. This confusion often results in delayed care and financial burdens, as highlighted in Patients 1-5

113.    The effectiveness of United's marketing tactics is evident in its substantial enrollment, adding 655,000 new MA members in the first quarter of 2023 alone. Such an increase, in the context of the exemplar patients and the Appendix, is indicative of the aggressive and misleading nature of its MA advertising campaigns.

114.    These practices not only contravene ethical marketing standards but also potentially violate specific legal statutes aimed at protecting consumers from false advertising and deceptive business practices, as outlined in the California False Advertising Law (Business and Professions Code § 17500 et seq.) and the Unfair Competition Law (Business and Professions Code § 17200 et seq.), among others. The following detailed allegations will elucidate the extent and impact of United's deceptive practices.

115.    United and its marketers and agents inaccurately advertise the following, often through a barrage of unsolicited emails, calls, and advertisements, in order to enroll as many OM  patients into its MA plans by incorrectly representing the following:

(1) Its relationship with CMS and the Medicare program;

(2) That its MA plan *"combines"* with Original Medicare program for an added plan, not a replacement;

(3) Failing to represent that the MA requires the beneficiary to fully relinquish all of their OM benefits;

(4) Over broadly representing that MA patients receive "better" benefits;

(5) That the MA plan allows them to continue seeing all of their same doctors;

(6) That the MA plan directory of providers is unlimited;

(7) The restrictions of the MA plan which requires prior authorization for services which otherwise were unrestricted under Medicare;

(8) The very limited vision and dental benefits as overbroad coverage;

(9) Sales agents state that they cannot even discuss any MA plan options without full disclosure of the beneficiaries' full social security, name, and birthdate;

(10)    MA plans often deny care based on the insurers' internal determinations about the type of care required, overruling the physicians handling the cases;

(11)    Their improper denial rate of clean claims,  which is close to 13-20%;

(12)    Neglecting to transparently explain to beneficiaries that their MA claims may be fully denied and they are responsible for payment in full if they do not stay within the United MA network;

(13)    The deadline for enrollment for dual eligible beneficiaries whereas Defendants know that these particular beneficiaries are eligible for quarterly changes in their plan;

(14)    That disenrollment is simple and thus fully reversible, whereas new medical underwriting would be required for a new Mediap plan; and

(15)     Preventing enrollees from knowing that they could be eligible for a special enrollment period to get into a more suitable plan if they had previously enrolled based on misinformation.

116.    United engages in pervasive and deceptive marketing practices, misrepresenting

the nature and benefits of its MA plans. United's communications broadly claim that their MA plans offer "more benefits than Original Medicare," yet fail to disclose essential information. This includes the limited MA provider networks, prior authorization requirements, and the impact of these limitations on timely access to care. This omission is especially misleading given United's express claims of offering "more benefits" than OM. United's failure to provide full and transparent disclosures constitutes misleading and deceptive practice, violating California's false advertising law.

117.   United was fully aware that its MA enrollees were under the mistaken impression that they would retain their OM benefits alongside the additional advantages of the MA plans. This belief was rooted in United's marketing strategies, which suggested that the MA plans 'combined' with OM, obscuring the fact that enrollment in MA required beneficiaries to forfeit their OM coverage. United capitalized on this confusion, knowing that many enrollees were not aware of the full implications of switching to an MA plan.

118.   Besides being deceptive, unfair, and unconscionable, United's practices breach the implicit trust and contractual promises made to Medicare beneficiaries. In breach of these promises, United systematically enrolled beneficiaries in MA plans without fully disclosing the limitations and differences compared to OM, leading to unexpected denials, limitations in healthcare access, and financial burdens for the beneficiaries, despite assurances of enhanced benefits and comprehensive coverage.

119.   United's misrepresentations and omissions made were not accidental, but were intentional actions carried out in accordance with United's written policies and routine practices related to marketing and enrolling beneficiaries in MA plans. These practices resulted in beneficiaries being misled about the nature and limitations of MA plans compared to OM, leading to adverse impacts on their healthcare access and financial well-being.

120.   United's direct email marketing and ads use misleading language and imagery, causing confusion among beneficiaries. These materials often appear as official government communications or use Medicare logos deceptively, targeting vulnerable populations like those with limited language comprehension, disabilities, diverse sexual orientations, and identities, and those affected by persistent poverty or inequality. Additionally, United's marketing campaigns have been found to harass recipients by sending countless unsolicited  emails to the

same address under various names, creating a false sense of widespread interest or urgency. The emails directly demand immediacy and necessity for beneficiaries to act but no action whatsoever is  required if the beneficiaries wish to simply retain their OM. The barrage of some 24 emails to one OM beneficiary alone pressure consumers into making quick and unconsidered decisions without fully understanding the implications of enrolling into MA and by default thus disenrolling from OM.

121.    A notable aspect of United's deceptive practices is the targeting of beneficiaries with Alzheimer's disease or dementia, mentally incapacitated individuals, and beneficiaries with limited English proficiency, resulting in enrollments without proper consent. See **Exhibit "D"**.

122.    United's advertisements falsely suggest "$0 Exams and Care," misleading beneficiaries about the actual costs involved in their plans. Despite substantial disenrollments due to these misleading practices, United has achieved a dominant market share in the MA plan market.

123.    United's marketing creates undue urgency, employing countdowns and phrases like "the clock is ticking," leading beneficiaries to believe they will lose benefits if they do not act quickly. Moreover, United's failure to clarify that these are solicitations and not government-related communications adds to the deceptive nature of their marketing. United's practices have led to enrollments under false pretenses, including misrepresentations about coverage networks and plan benefits.

124.    The impact of United's deceptive practices is extensive, affecting vulnerable Medicare populations, including individuals dually eligible for Medicare and Medicaid and those with cognitive impairments. United's tactics involve misleading representations, pressure tactics, and aggressive lead generation, impacting beneficiaries' understanding of their healthcare options and leading to financial harm or diminished healthcare access.

125.    United's marketing promises such as added benefits "combined" with OM benefits are misleading. The vision and dental benefits in their MA plans are presented as comprehensive, yet in reality, these benefits are extremely limited in scope and value. Research indicates that MA plans, like those offered by United, reduce services, selectively disenroll sicker patients, and use lower-rated healthcare providers compared to OM.

126.    United's MA plan has 4 key pitfalls with which United fails to consciously fails to

disclose in its advertisements: MA patients may not be able to see their regular or trusted doctors, they will be of the 99% of MA members who will require prior authorization for a large number of services causing delay and denial of care, their local hospitals and clinics may not accept their insurance, and they might end up paying for benefits which they are ultimately unable to use like dental services and fitness club benefits.

127.    United's marketing tactics include targeting special needs beneficiaries with substantial cognitive impairments, and employing deliberately vague and ambiguous terms in ads and emails. This practice misleads seniors and is particularly egregious given the vulnerable nature of the targeted population. United's telephone agents often insist on obtaining full identifying information and Medicare number from beneficiaries at the outset of calls, leading to numerous instances where beneficiaries were enrolled in MA plans without their knowledge or consent. This practice is incentivized by large commissions for each enrollee.

128.    United's advertisements promise increased Social Security checks, using this tactic as a "bait and switch" to lure beneficiaries into plans that may not meet their needs. United's marketing materials, including emails and mailers, often appear to be official government documents, adding to the confusion and deception experienced by beneficiaries. The company employs tactics such as countdown clocks and urgent language in its communications, misleading beneficiaries about the need to act swiftly and potentially leading to enrollment decisions without adequate consideration.

129.    United's misleading and deceptive marketing practices constitute a violation of Sections 17200 and 17500 of the California Business and Professions Code, as they amount to unfair competition and false advertising. These practices have caused harm to Plaintiff and the class they represent. Despite knowing the detrimental effects of their marketing tactics, United has not altered its practices, continuing to mislead beneficiaries and enrich itself at the expense of providers and beneficiaries.

130.    In summary, United's marketing practices for its MA plans are deeply deceptive, targeting vulnerable populations, and resulting in significant harm to both beneficiaries and healthcare providers. This conduct is claimed to violate sections of California's false advertising and unfair competition laws and has led to systemic issues in the MA market.

131.    United's advertisements are misleading and consumers make decisions to enroll

in its MA plans based on these misrepresentations, as demonstrated in Patients 1, 2, 3, and 4.

## UNITED'S AGGRESSIVE MEDICARE ADVANTAGE ENROLLMENT TACTICS ARE INCENTIVIZED BY OVERSIZED AGENT COMMISSIONS

132.   United employs aggressive enrollment tactics for its MA plans, significantly incentivized by oversized agent commissions and bonuses for each OM disenrollment, as detailed in **Exhibit "A"** - "*UnitedHealthcare Insurance Company Agent Agreement.*" This agreement underscores United's structured approach to expand MA enrollment, leveraging and skewing the financial motivations of agents to enroll callers in the United MA plans rather than retain OM.

133.   These intermediaries, including sometimes third-party brokers and agents, receive commissions up to $762 or more per sign-up, with their compensation often misaligned with beneficiaries' best interests. In California, commissions for enrolling beneficiaries into MA plans can exceed $539, raising concerns about the integrity of the enrollment process.

134.   Despite acknowledging the potential for aggressive marketing tactics, as indicated by their alleged policy of terminating marketers after exceeding a quota of complaints, United manipulates its reporting to regulatory bodies. United maintains a *dual set of books:* one internal, reflecting the actual, and significantly higher, number of consumer MA advertising and enrollment complaints, and another sanitized version, which they submit to CMS. This practice of concealing the true extent of consumer grievances indicates a deliberate effort to evade regulatory scrutiny and continue their aggressive enrollment tactics without repercussion.

135.   The impact of these incentivized enrollments is profound. Many MA enrollees report being misled into believing they would retain their OM benefits and that their preferred providers were covered, only to discover later the limitations and exclusions of United's MA network.

136.   United's marketing tactics also include violations of CMS guidelines, such as initiating unsolicited calls without prior consent and employing coercive sales tactics. Misrepresentations extend to United's relationship with the Medicare program, including communications that misleadingly appear as official Medicare information and falsely represent United as a "*Medicare Plan Expert", rather than a  MA plan expert.* United's  brokers and agents are not legally required to present OM beneficiaries with all available options in their area, or

even mention OM. Further, the agent's compensation is not always aligned with how they would like to advise beneficiaries.

## UNITED'S OBSTRUCTIONIST MEDICARE ADVANTAGE CLAIMS PROCESSING MATERIALLY PREJUDICE MEMBERS

137.     United's MA patients do not receive the same level of medical care and services which are offered to OM patients for a number of reasons. This disparity stems from United's well known systematic delay and denial in processing MA claims, a practice entrenched in their business model. United's approach involves restrictive prior authorizations, pre-payment medical record reviews, systemic claim denials, and other hurdles, impeding timely and equal access to necessary healthcare services.

138.     United's pattern of requiring multiple burdensome and laborious appeals for routine MA claim processing reflects a bad faith approach, effectively deterring providers from servicing MA patients efficiently and starkly contrasting with the unrestricted access OM patients enjoy.

139.     These practices, including selective payment for office visits (OV) only, routine denial of associated procedures and lab tests, and high denial rates even when medical records support claims, reflect a deliberate business strategy to limit healthcare services for MA members. This approach not only contravenes the MA requirement to cover the same services as OM but also leads to substantial out-of-pocket costs for beneficiaries. An out of network MA claim typically means the MA beneficiary is stuck with costs with OM would otherwise have fully covered.

140.     United's admitted policy of improperly using *InterQual* criteria to review hospital admissions for denials further exemplifies their tactics to avoid payment for services aligning with OM regulations, as detailed in **Exhibit C.** Such practices not only impede access to care but also burden patients and providers with repetitive and unjustified demands for medical records.

141.     This pattern of behavior points to United's overarching strategy to minimize service provision under MA plans, which results in a substantial disparity in the level of care MA members receive compared to OM beneficiaries.

142.    The protracted and often futile claims appeal process, combined with United's use of medical records obtained in these appeals to inflate risk adjustment coding to CMS for additional "bonus" compensation, reveals a systemic approach to maximize profits at the expense of member care. Despite collecting fixed monthly fees per enrollee from CMS, United demonstrates a systemic reluctance to honor claims, instead using the medical data to make the patients appear sicker than they are to secure further CMS overpayments.

143.    United's requirement for providers to incur costs in retrieving and submitting extensive medical records, only to deny receipt and claims, further illustrates their obstructive practices. Such tactics lead to significant administrative burdens for providers and result in additional profits for United, as they collect CMS fees without corresponding claim payments. Specifically, United is known for these tactics:

   a)  Improperly and repeatedly demanding the same medical records already within their possession, and further denying they received the records[17];

   b)  Regularly denying claims on the grounds that medical records do not support the billed codes. However, this is nearly always a misstatement as the records do indeed substantiate the claims;

   c)  Even when they admit they received the medical records and the records fully support the claims, United maintains a near 80%-90% denial rate of high value MA claims.; and

   d)  Requiring a series of burdensome and lengthy appeals before it ultimately overturns a fraction of its incorrect denials, but that process has taken up to a year or more- which results in loss of good will toward the MA patient by the providers.  As a result,  MA patients are more likely to be delayed for services as compared to OM patients, are their care likely to be less than that afforded to OM patients who have no restrictions on their fee for service care.

---

[17] The April 2022 OIG report confirmed that MA prior authorization requests were improperly denied by falsely claiming inadequate or no medical records, whereas in reality the "beneficiary medical records already in the case file were sufficient to support the medical necessity of the services." See https://oig.hhs.gov/oei/reports/OEI-09-18-00260.pdf ( Last accessed on 12/1/2023.)

144.    Moreover, United's admission that they neither correct MA upcoding errors nor refund CMS for known MA overpayments, despite regulations mandating accuracy and truthfulness in submissions, underscores their systematic approach to exploiting MA program mechanisms for financial gain. (CMS estimates the total MA overpayments between 2008 and 2023 are $124 billion out of the Medicare Trust Fund.)

145.    The collective impact of these practices rightly contributes to the characterization of MA plans as "*Medicare Disadvantage,*" highlighting the stark contrast in care quality and accessibility compared to OM.


## UNITED ADMITS TO MEDICARE ADVANTAGE UPCODING AND RETAINING GOVERNMENT OVERPAYMENTS

146.    United admits to retaining MA overpayments from the government. These billion-dollar overpayments are partly attributable to United's  deceptive advertising practices and  wrongful acts  including upcoding, and the denial of payments for medically necessary care, often determined through AI-driven assessments.

147.    United has capitalized on profits resulting from the government's inability to regulate MA program overpayments. This is further compounded by United's deceptive practices in enrolling seniors and individuals with cognitive impairments into their MA plans. United's billing practices include overstating diagnostic codes, thereby overcharging the government and taxpayers. Additionally, the MA plans are characterized by narrow networks of healthcare providers and complex authorization procedures, both of which significantly limit beneficiaries' access to necessary care.

148.    United acknowledges that it has inflated diagnosis codes and other criteria to unjustly increase risk-adjusted payments under the MA plans. This manipulation has involved making patients appear sicker on paper than they are, leading to higher reimbursements.

149.    Despite several False Claims Act lawsuits filed against United for their MA billing practices, the company has successfully resisted government efforts to recoup these overpayments. In a notable legal action suing CMS, *UnitedHealthcare v. Burwell et al.,* filed in the District of Columbia, United contested the MA overpayment rule, seeking to retain overpayments obtained through its inflated MA risk scores.

150.     United's conduct in the MA program has included deceptive advertising practices, biased and one-way claim reviews, and false upcoding, all aimed at maximizing government reimbursements while disregarding fair practice. United's strategy has resulted in the overbilling of the Medicare Trust by exaggerating the severity of patient conditions, underpaying providers with MA fee schedules substantially lower than Medicare rates, and denying beneficiaries medically necessary care. This is further exemplified by their legal actions against the government to retain overpaid funds.

151.     By virtue of United's deception, MA members unknowingly disenrolled in from OM, regularly  still present their OM cards for medical services However, OM providers are no longer able to bill Medicare when a patient is covered through the United MA plan.  If they do, Medicare ultimately systematically denies these OM claims, paying nothing.  Then the United MA plan has to be billed, which will also deny the claim because the provider is not an MA provider.  This leads to systematic claim denials leaving the MA members responsible for these out-of-pocket claims.

152.     In summary, United's MA operations are marked by systematic overbilling of the Medicare trust by making its members look sicker on paper than they really are, underpaying providers by a MA fee schedule which is 30-40% lower than the Medicare fee schedule,  and denying  beneficiaries medically necessary care through the described schemes, artifice, and false and deceptive advertising.  United also sued the government to scrap the MA overpayment rule, allowing it to retain upcoded overpayments which it admits it was not entitled to obtain, and it obtains healthier members (without paying for their care) by virtue of misleading its members to seek care under their OM card, whereas they no longer have the OM plan or a valid OM card.

### UNITED MEDICARE ADVANTAGE MEMBERS ARE MISLED SURREPTITIOUS ADVANTAGE ENROLLMENTS AND ORIGINAL MEDICARE DISENROLLMENTS

A.     **Patient 1: Plaintiff**

153.     Patient 1, Bibi Ahmad, a 91-year-old female and dual eligible Medicare-Medicaid beneficiary with limited language proficiency, has been receiving Medicare since January 1, 1997. During an 11-month period from October 2022-November 2023, she received <u>over 24</u>

unsolicited emails from United, often several in a week as documented in the Appendix, promoting its MA plan. United's barrage of emails created a sense of panic, urgency, and confusion, leading to a belief that they were official communications from Medicare and that she needed to act both to preserve her OM benefits, and to "avoid penalties."

154.   With marginal  annual earnings and relying solely on Social Security Income (SSI), Patient 1 had no cost-sharing or co-pays under her OM. She also enjoyed the freedom to choose any physician and receive care at all facilities and laboratories, with full prescription coverage through Medicaid, and never incurred fees for co-pays, medications, or surgeries.

155.   On December 1, 2022, responding to United's unsolicited MA emails, Patient 1's family contacted United at 877-690-1761. In a conversation with a United representative, "Crystal," and later with a licensed sales agent, Anthony Tillman, Patient 1 was assured that enrolling in a MA Plan would not mean giving up OM. United represented that the MA plan was a secondary insurance offering additional benefits like dental, vision, and hearing, emphatically representing  it would supplement rather than replace her OM  Parts A and B. United responded to these MA questions as follows:

Question: "So I can still use my traditional Medicare?"

Answer United: "Yes you can still use your traditional Medicare."

Question: Any restrictions? Am I giving up my Medicare?

Answer-United: "No, no, no...its's a secondary insurance."
    "It gives you a fallback."
    "If you get a Medicare Advantage Plan, we cover your dental, vision, and hearing."
"You're getting more insurance than Medicare."
"You're not losing Medicare Parts A and B."
"If you are over age 65, you still get both Parts A and B."

156.   Then the call was transferred to a second United agent, Anthony Tillman, who advised he is a licensed sales agent on a recorded line, and his direct number is 844-544-1953. He will not proceed any further or respond to any questions about the MA plans until the caller produced all information from Patient 1's government-issued "red, white, and blue Medicare card". He insists on the full date of birth, Medicare number, social security number, and zip code... in order that he access the Medicare database and obtain information about the policy

and coverage.

*Question: "Am I Giving Up My Medicare Part A And B?"*

*Answer-United: "No ma'am! It includes all of it... won't give it up."*
*"You keep both insurances."*
*"It adds benefits under drug and adds on Medicare part C."*
*"They will give you extra benefits like vision, hearing, dental."*
*"They provide innovation and 'competition' to give you extra benefits and over the counter and utility benefits, grocery benefits."*

*Question... Stopped- United Anthony states he will not respond to any other questions about the MA plan without disclosure of the full Medicare number and date of birth.*

*Question: "How do I get out of the Medicare Advantage plan?"*

*Answer-United:   "You can call in last quarter to disenroll."*
*United:  You are not giving up your Medi-Medi.. you're only adding to it—we're adding on to the plan. The new plan just coordinates your plan- but you don't lose your Medi-Medi. You still have both to fall back on."*
*United: "You're not disenrolled from Medi-Medi- will still have it."*

157.    However, Patient 1 had no need for enrollment in an MA plan, which would have restricted her physician access, taken away her OM benefits, and imposed prior authorization restrictions and other limitations, including potential denials of care — none of which she faced under OM. The barrage of emails to Patient 1 never advised her of the pitfalls of MA enrollment and instead misrepresented that she would receive enhanced benefits that would *combine* with, not replace, her OM.

158.    The misleading nature of United's email campaign and "Right Plan Promise" amounted to deceptive advertising, causing Patient 1 considerable panic, distress, confusion, and emotional distress. This experience underscores the impact of United's marketing tactics on vulnerable individuals like Patient 1, who are led to believe inaccurately that their healthcare coverage and access would be enhanced, not diminished, by switching to a United MA plan.

**B.    Patient 2:  S.J.**

159.    Patient 2, a 71-year-old resident of Laguna Woods, California, had been enrolled in Medicare since 65, with Part B benefits commencing on January 1, 2017. In late 2018, she received multiple solicitations from United promoting a supplemental health insurance plan with superior benefits to Medicare. Upon enrolling in early 2019, she was misled by a United

agent into believing that she would retain OM as primary insurance with United MA as an additional "fallback" benefit. However, United enrolled her into their MA plan under Monarch Healthcare, causing Patient 2 to completely and unknowingly relinquish her OM benefits and incur $2,480.50 in out-of-pocket costs for medical and surgical services which United refused to cover.

160.    At no point was Patient 2 informed by United that she would be relinquishing her OM benefits, nor was she ever advised to stop using or presenting her government-issued OM card for services. This led her to believe her OM coverage was still valid. United's switch and termination of her OM benefits led to claim denials for services with her OM doctor, which would have been covered under Medicare, leaving her responsible for the full costs.

161.    Relying on United's misrepresentations, Patient 2 used her OM card for services at Company 1, an OM provider, believing she had not exchanged her OM for any MA or HMO plan. However, United's MA enrollment led to claim denials for services with her OM doctor, leaving Patient 2 responsible for the full costs. Despite repeated billing and submission of medical records, United denied her claims, forcing her to personally pay $2,481.50. Furthermore, United's refusal to pay for genuine medical services rendered to their member resulted in unjust enrichment because United gained a healthier member without remitting any costs for the care.

162.    On November 11, 2022, "Optum Care Network," representing United and Monarch, sent a misleading "Second Request" medical records demand letter for Patient 2's claim which they had already repeatedly denied. The letter claimed an inability to process the claim and demanded resubmission with all physician notes and medical records, despite full knowledge that Company 1 was neither an MA provider nor part United's MA network. This action, far from being a genuine attempt to resolve a claim, served two purposes. Firstly, it imposed unnecessary administrative burdens and costs on providers, knowing that United MA had no obligation to pay for OM services. Secondly, and more strategically, United used the diagnoses from these resubmitted records to file bonus payment claims with Medicare, thus benefiting from the MA bonus structure designed to reward care for "sicker patients". This dual approach of refusing to pay for services while leveraging patient information for financial gain

resulted in unjust enrichment, demonstrating United's intent to manipulate the system for profit at the expense of genuine medical care and ethical practice[18].

### C.    Patient 3:  D.D.

163.    Patient 3, D.D., a 96-year-old residing in Laguna Woods, California, had consistently accessed medical care without issue for 25 years as a "dual eligible" beneficiary of Medicare and Medicaid ("Medi-Medi"). She enrolled in OM  upon turning 65, with Part A beginning in  1991, and Part B in 1996. Until 2018, she had not paid out of pocket for services under OM and was able to select any doctor of her choice.

164.    After moving to California, she received advertisements from United promoting additional health insurance plans, but she was not informed that enrollment into the MA plan would lead to the loss of her OM. She was led to believe that enrolling in a United MA plan would supplement, not replace, her existing Medi-Medi coverage. Contrary to United's representations and her understanding, her enrollment in United's MA plan resulted in the loss of her OM benefits, leading to denied claims and loss of access to her long-standing healthcare providers.

165.    Patient 3 later discovered the loss of OM benefits in June 2022 when an OM-accepting doctor's office informed her of the denial of her claims, leaving her responsible for the full payment. She faced rejection from numerous doctors due to her new MA status and was stricken with grief at the prospect of seeking new doctors at the age of 96.

166.    Patient 3's unwitting MA enrollment led to cancer treatment delays, inability to continue care with her regular cancer doctor, and ultimately rejection from numerous doctors due to her concealed MA status. She was sent to collections and sued for unpaid bills, and United fully denied her claims. She and the providers also incurred substantial clerical and administrative costs unnecessarily due to United's actions, their repeat demands for medical

---

[18] United's approach in handling claims exemplifies a deliberate three-fold strategy to (1) deny payments for claims, (2) retain capitated monthly Medicare payments per beneficiary (paid regardless of if United ever pays a single claim for the member), and (3) demand medical record and use diagnosis codes from the unpaid services to obtain unjust benefit from the Medicare bonus MA structure by making the patients look sicker than they are, and also without incurring corresponding expenses.

records already within their files, and use of diagnosis from those records to use for their MA bonus reports to Medicare. United obtained unjust enrichment of $1705 by not paying the claim, and also having a healthier member as a result of the received uncompensated services.

**D.    Patient 4: J.S.**

167.    Patient 4, J.S., a 59-year-old resident of Laguna Niguel, California, qualified for Medicare (Parts A and B) and Medicaid as a dual eligible, starting on June 1, 2022, due to a disability. She is also a Qualified Medicare Beneficiary ("QMB") with waived deductibles for the eligibility period.

168.    From November 4, 2022, to December 7, 2022, Patient 4 received unsolicited emails and correspondences from United which, as documented in the Appendix, created panic, urgency, and confusion. She believed these emails were from Medicare and that failing to respond would result in losing her OM benefits and other "penalties." United's emails never advised her of the pitfalls of enrolling in a MA plan. Contrarily, United misrepresented that enrolling in their MA plan would provide better benefits that would combine with, rather than replace, her OM.

169.    Despite having no basis for enrollment in an MA plan— which would have restricted her physician access, taken away her OM, and imposed prior authorization restrictions and other limitations— Patient 4 became enrolled in a MA plan by January 1, 2023 due to deceptive MA advertising. She believed she retained her OM benefits.

170.    From January 2 to January 17, 2023, Patient 4 sought services with multiple OM providers and presented her OM card, under the impression that she had unrestricted access due to her "Medi-Medi" status. However, on January 27, 2023, when she presented her OM "red, white, and blue card" at a new medical appointment with Company 2, an OM provider, she was informed for the first time that she was enrolled in an MA plan and had thus relinquished her OM coverage. This revelation left her dumbfounded, as she was never advised by United about the enrollment in MA or the relinquishment of her OM benefits. She was forced to cancel her appointment, delay medically necessary care, and spend considerable time contacting Medicare and the MA plan to rectify her erroneous enrollment.

171.    Given Patient 4's status as a dual-eligible QMB with no out-of-pocket costs for medical services or prescriptions, there was no financial or practical reason for Patient 4 to

1   enroll in an MA plan. Such enrollment only restricted her otherwise unhindered access to care,

2   limited her network of providers, and entangled her in a web of complex prior authorizations

3   and pre-payment medical record reviews for tests and services, which would otherwise be fully

4   covered by OM without such restrictions. She also had full access to expansive "vision, dental",

5   and mental health services under Medi-Medi, which would have only been restricted and

6   diminished substantially under an MA plan.

7       E.      **Patient 5: G.L.**

8       172.    Patient 5,  a 91-year-old beneficiary of United MA, experienced a serious fall in

9   May 2022, resulting in a fractured leg. He was insured by United MA at the relevant period. He

10  was initially treated at a local hospital and then recommended for hospice care due to his

11  deteriorating health condition.

12      173.    Despite the necessity for ongoing skilled nursing facility ("SNF") care as per

13  medical advice, United abruptly terminated Patient 5's  overage in July 2022. This decision was

14  made contrary to the evaluations of his healthcare providers, who deemed further inpatient care

15  as medically necessary.

16      174.    Under OM such SNF care would typically be covered for at least 100 days.

17  However, due to the improper termination of coverage under the United MA plan, Patient 5's

18  family was forced to bear significant out-of-pocket expenses for his continued medical care.

19      175.    From July 2022 until July 2023, Patient 5's  family incurred out-of-pocket

20  expenses totaling approximately $144,000 to $168,000, based on monthly costs ranging from

21  $12,000 to $14,000. These expenses represent a considerable financial burden that would have

22  been largely, if not entirely, covered under OM.

23      176.    Patient 5's case vividly illustrates the detrimental financial impact and the

24  disparity in care afforded by United MA as compared to OM, highlighting the harsh realities

25  faced by beneficiaries under United's inferior SNF coverage policies.

## COUNT I
## VIOLATION OF THE FALSE ADVERTISING LAW (FAL) (CAL. BUS. AND PROFESSIONS CODE § 17500 ET SEQ.)

        177.    Plaintiff and the Class Members re-allege and incorporate by reference the

foregoing paragraphs as though fully set forth herein.

178. In relevant parts, Bus. and Professions Code § 17500 applies to false advertising in general and sets forth:

> "It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised."

179. United, through various media including unsolicited emails, advertisements, and telephone communications as underscored in the *Appendix,* violated Bus. and Professions Code § 17500 by publicly making or disseminating untrue or misleading statements, or by causing untrue or misleading statements to be made to the public, in or from California, with the intent to induce members of the public, specifically seniors and those eligible for Original Medicare benefits, with the intent to induce OM members to enroll in its MA plans, and rely on its inaccurate statements about the nature and benefits of their MA plans, representing these plans as combining the MA plan plus Medicare Parts A and B, and the MA plan being superior to benefits under OM. These untrue and misleading statements include but are not necessarily limited to:

a) Statements that United's MA plan *combines* with OM and provides an enhancement to, not a replacement of OM;

b) Statements that United's MA plan includes "*all* the benefits of Original Medicare plus extra benefits";

c) Statements that there was urgency and immediacy required to avoid Medicare penalties by not responding to United MA plan inducement and "doomsday countdown clock";

d) Statements that United MA members may continue to present their OM cards for OM benefits, when it was known by United that the OM card would be invalid and all such claims would be rejected by Medicare;

e) Statements that United MA members are entitled to retain all government benefits of OM, plus add on a "fallback" plan by having MA; and

f) Statements regarding their coverage for services without disclosing the plan limitations, restrictions, and prior-authorization requirements.

180.    United's statements were known, or by the exercise of reasonable care should have been known, to be untrue or misleading. United, being an experienced and knowledgeable provider of health insurance plans, had the means and the duty to verify the accuracy of its advertising claims. Furthermore, these misstatements and MA advertising issues have been the subject of a number of government and OIG reports which have been available to United for many years,  and which also formed the basis for a number of false claims lawsuits which the government pursued against United for its MA plan conduct.

181.    United knew, or should have known that their statements were untrue or misleading at the time they made them and at the time they induced the Class to respond to their inaccurate advertisements and induce enrollment into their MA plan.

182.    Plaintiff and the Class Members genuinely relied upon these false and misleading statements in deciding to enroll in United's MA plans, to their detriment. As a direct result of this reliance, United MA members  suffered financial harm and disruptions in healthcare coverage. As exemplified in Patients 1-5, the United MA members incurred out-of-pocket costs ranging from $2000-$14,000 for medical services which United improperly denied, and which would have otherwise been covered under  OM.

183.    United's conduct of disseminating false and misleading advertisements was part of a deliberate and systemic strategy to induce enrollees to disenroll our of their government OM plan and into United's MA plan, causing widespread harm to consumers, particularly the elderly, disabled,  and vulnerable.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT II

### UNFAIR COMPETITION BY VIOLATION OF SECTION 17200 OF THE CALIFORNIA BUSINESS AND PROFESSIONS CODE (UCL)

#### Against All Defendants

184.    Plaintiff and the Class Members re-allege and incorporate by reference the foregoing paragraphs as though fully set forth herein.

185.    United has  engaged in, and continues to engage in, unlawful, fraudulent, or unfair practices in the conduct of a business, which acts or practices constitute unfair competition, as that term is defined in Bus. and Professions Code § 17200. Such acts or practices include, but are not limited to, the following:

a)  Issuing MA advertisement and plan reports that were neither objective nor accurate, and were influenced be their desire for pleasing stockholders to gain the business or win additional business and revenues;

b)  Issuing plan ratings that were not independent, were not objective or credible, and were influenced by profit motives to unfairly dominate the MA market;

c)  Failing to deal fairly and honestly with OM beneficiaries, including those induced into enrolling into United MA plans by inaccurately stating that the MA plan was an addition to OM, not a replacement;

d)  Failing to manage the conflict of interest inherent in their for-profit MA model, which increased profits by unfairly delaying and denying payments for care;

e)  Maintaining a dual set of  books and submitting a more favorable set to CMS which inaccurately represented their correct number of consumer complaints about their MA advertisement and fraudulent  enrollment; and

f)  Violating Bus. and Professions Code § 17500 as described in Count I.

186.    United's deceptive advertising and unfair business practices include but are not limited to:

a)  Misrepresenting the nature and extent of MA coverage under their managed care plans which resulted in artificial OM disenrollment;

b) Concealing the requirement for OM beneficiaries to relinquish their traditional OM benefits in order to enroll in United's MA plan;

c) Creating confusion, panic, and urgency among potential enrollees through misleading advertising and doomsday countdown clocks;

d) Failing to disclose substantial  limitations on healthcare provider choices; and

e) Engaging in a systematic scheme to mislead consumers for United's financial gain, at the expense of the consumers' rights to accurate and transparent information.

187.   The acts complained of in each of the preceding paragraphs of this Complaint, and each of them, constitute unfair, unlawful, and/or fraudulent business acts and practices in competition, in violation of Section 17200 of Business and Professions Code (hereinafter "UCL[19]"). Such acts and violations have not abated and will continue to occur unless enjoined.

188.   United violated Bus. and Professions Code §17200 through their deceptive advertising and marketing practices as described herein, have engaged in unlawful business acts and practices by making false and misleading statements about the nature and benefits of their MA programs, in direct violation of numerous state laws and regulations governing insurance and advertising practices.

189.   Defendants have further engaged in unfair business practices by manipulating the market for healthcare insurance, exploiting the vulnerabilities of elderly, infirm, and disabled consumers, and establishing a dominant presence in the California healthcare market through deceptive means, thereby harming both consumers and competing healthcare providers.

190.   United has had the largest share of MA enrollment and largest growth in enrollment since 2010, increasing from 20 percent of all MA enrollment in 2010 to 29 percent in 2023[20].   United has achieved this rank through a number of known inaccurate marketing

---

[19] The Cal Supreme Court holds that under the UCL, `[p]revailing plaintiffs are generally limited to injunctive relief and restitution.' [Citation.]" (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1144 [ 131 Cal.Rptr.2d 29, 63 P.3d 937].)

[20] Medicare Advantage in 2023: Enrollment Update and Key Trends | KFF

tactics. For the seventh year in a row, enrollment in United's plans grew more than any other firm, increasing by more than 1 million beneficiaries between March 2022 and March 2023[21].

191.    The average Medicare beneficiary in 2023 has access to 43 MA plans, the largest number of options ever. Despite most beneficiaries having access to plans operated by several different firms, MA enrollment is highly concentrated among a small number of firms. United, alone, accounts for 29% of all MA enrollment in 2023, or 8.9 million enrollees.

192.    As demonstrated in the Appendix (24 United emails to one OM  beneficiary spanning from November 2022 to November 2023), United's MA enrollment has been successful through inaccurate and directed targets-  and misleading a highly susceptible group of the population, who are elderly, disabled, cognitive impaired, and/or Medicare eligible who live on marginal fixed incomes.

193.    United has systematically engaged in practices designed to deny nearly all high value MA claims on the first pass as a default approach, operating under a calculated presumption that most beneficiaries and providers will either not detect or not challenge these denials. This practice is encapsulated in United's own internal communications and strategies, where it is suggested to "[d]eny [all claims] and see which ones come back on appeal." Such a policy is implemented with the understanding that the majority of patients and providers, often overwhelmed or deterred by the complexity of the appeal process, will ultimately opt to pay the bills themselves rather than contest the denials. *See* Patient 2 and Patient 3.

194.    In internal corporate documents, United coldly calculates that only an estimated less than 5% of MA individuals whose claims are denied will actually appeal the decision. This approach, focused on cost-saving rather than patient care or contractual obligations, further evidences United's systematic and deliberate strategy to enhance profits at the expense of its beneficiaries.

---

https://www.kff.org/medicare/issue-brief/medicare-advantage-in-2023-enrollment-update-and-key-trends/ (Last accessed 11/18/2023)

[21] Medicare Advantage in 2023: Enrollment Update and Key Trends
 https://www.kff.org/medicare/issue-brief/medicare-advantage-in-2023-enrollment-update-and-key-trends/#:~:text=Medicare%20Advantage%20Enrollment%20by%20Firm%20or%20Affiliate%2C%202010%2D2023&text=For%20the%20seventh%20year%20in,March%202022%20and%20March%202023. (Last accessed 11/18/2023)

195.    United further engaged in a systematic scheme to save money at the expense of beneficiaries and providers, resulting in substantial financial gains for the company. This scheme at one end begins with deceptive advertising to induce enrollment into their MA plan, and at the back end involves automatically denying MA claims and relying on the low probability of provider appeals due to administrative burdens. In cases where appeals were made, United would often repeatedly demand medical records they already possessed as a condition of processing the claim, reject previously paid OM claims, and delay payments until many months after services were rendered, leaving patients and providers with unpaid bills. Further, United benefited by having its members receive medical care at no cost to itself, while still receiving monthly government capitation PMPM fees for each Medicare enrollee, regardless of whether any claims were paid. Lastly, United also manipulated patient data, using false codes to make patients appear sicker than they were, thereby unjustly enriching itself through higher payments from the government, while failing to pass these savings to beneficiaries  or return overpayments. These cumulative practice led to billions of dollars in unjust earnings for United, boosting its bottom line and shareholder value, with no corresponding benefit to its members or the healthcare community. *See* Exhibits D, E, and F.

196.    These acts have caused and continue to cause significant harm to consumers who were misled into enrolling in Defendants' plans, resulting in loss of OM benefits, restricted access to healthcare providers, unexpected out-of-pocket medical costs, and denial of necessary services. The conduct of Defendants as alleged herein constitutes a fraudulent business practice under the UCL, as it involves deception, misrepresentation, and concealment of material facts known to Defendants, with the intention that consumers rely upon such deception, to their detriment. Defendants' actions have also caused substantial injury to competitors and the marketplace by distorting the competitive conditions in the healthcare market in California. Plaintiff, and the Class Members as a result of Defendants' unlawful, unfair, and fraudulent business practices, have suffered injury in fact and have lost money or property, or incurred debt for unpaid medical bills.

197.    The acts complained of in each of the preceding paragraphs of this complaint, and each of them, constitute unfair and/or unlawful acts in competition in violation of Section 17200. Such acts and violations have not abated and will continue to occur unless enjoined.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT III

### VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT, CAL. CIV. CODE, § 1750 ET SEQ. (CLRA)
### Against All Defendants

198.     Plaintiff and the Class Members re-allege and incorporate by reference the foregoing paragraphs as though fully set forth herein.

199.     United engaged in deceptive advertising by inaccurately representing their MA plans as equivalent to OM or traditional fee-for-service ("FFS") Medicare. This deception includes, but is not limited to, statements claiming MA plans offer *'all the benefits of Original Medicare plus extra*,' and suggesting that enrollment in United's MA plans would not result in the loss of OM benefits.

200.     United engaged in deceptive advertising and marketing by falsely representing their MA plans as equivalent to OM. This included misleading statements about the benefits, coverage, and restrictions of their MA insurance products.

201.     United's misrepresentations were material, influencing the decision-making process of elderly, infirm, and disabled beneficiaries. Defendants falsely promoted the MA managed care plans as having comparable benefits and freedom of choice akin to OM.

202.     Consumers relied on United's inaccurate  representations, under the genuine belief that they were maintaining OM while merely adding additional benefits with a new MA plan. This reasonable reliance, influenced by Defendants' decade-long scheme and targeted advertising to a vulnerable demographic, led to unexpected consequences including loss of preferred healthcare providers and unexpected out-of-pocket medical costs. United engaged in this deception to disenroll the largest number of beneficiaries  out of OM, obtain the largest market share of MA patients, and for the United shareholder's  financial gain.

203.     As a direct result of justifiable reliance on United's inaccurate representations, consumers suffered significant damages, including the loss of OM eligibility, being restricted to limited United MA healthcare provider networks, and facing unexpected medical expenses and denied services, contrary to their understanding of the MA plan benefits. United knowingly and intentionally concealed critical information regarding the relinquishment of government OM benefits when enrolling in their MA managed care plans, because otherwise many OM enrollees

including Patients 2,3, and 4 would not have enrolled in United MA.

204.    Defendants failed to disclose essential information, including the limitation on the choice of healthcare providers and the complete relinquishment of OM benefits as an express condition of enrolling into United's MA plans.  Such omissions were deliberate and designed to mislead consumers.

205.    Defendants' campaigns deliberately created a false sense of urgency and confusion, pressuring consumers to make hasty decisions within misleading 'deadlines' without full awareness of the implications, particularly concerning the loss of OM benefits and the limitations of United's MA plans.

206.    The conduct of Defendants constitutes unfair and fraudulent business practices under the CLRA, as it involved a systematic approach to deceive and mislead consumers for financial benefit, at the expense of the consumer's right to transparent and truthful information.

## COUNT IV
### NEGLIGENT MISREPRESENTATION
#### Against All Defendants

207.    Plaintiff and the Class Members re-allege and incorporate by reference the foregoing paragraphs as though fully set forth herein.

208.    United owed a duty of care to the Plaintiff and the Class Members, including Patient 2 and Patient 3, as it engaged in business practices that directly affected the Plaintiff and the Class Members' decisions regarding their healthcare coverage.

209.    United, through its agents, producers, and marketing materials, made representations to Plaintiff and the Class Members  that their MA plans would provide benefits that "*combine*" with their  OM, implying an addition, rather than  a replacement of OM. However, United did not disclose that enrollment in their MA plans would result in the complete relinquishment of OM benefits, and consequently, beneficiaries' red, white, and blue OM cards would become void and unusable for any further services. Specifically, United consciously did not advise MA beneficiaries that they must not present their red, white and blue OM cards for any further services as it was void.

210.    In conversation with United representative ("Crystal") on December 1, 2022, it was falsely explained that United's  MA Plan is an additional  insurance and does not replace

Medicare Parts A and B. The representative inaccurately asserted that individuals could maintain both their OM and the new MA Plan, with the MA Plan supposedly offering additional coverage for dental, vision, and hearing, which was portrayed as an enhancement rather than a replacement of their existing OM coverage. United emphasized that individuals can still use their OM alongside the new MA plan. Additionally, United's representative assured that individuals over age 65 can maintain both Medicare Parts A and B while having the MA Plan as a "fallback"– which is untrue.

211.    United licensed sales agent Anthony Tillman explained that their MA plan includes Medicare Part A and B without individuals giving up their OM coverage at all. United misstated that both insurances (MA and OM Parts A and B) coexist, and the MA plan offers additional benefits such as "free groceries", prescription drug coverage, Medicare Part C, vision, hearing, dental, and various other perks like over the counter medications and utility benefits. United advises that it allows disenrollment only in the last quarter of the year although that is untrue since Medi-Medi beneficiaries may change quarterly without penalty. In sum, United consistently emphasizes that individuals retain their OM coverage alongside the new plan, which coordinates with it- not replaces the OM.

212.    A significant majority of dual eligible Medicare beneficiaries, nearly ninety-nine percent, were unaware that they forfeited their OM when induced to enroll in United's MA plans. In most instances, United representatives explicitly stated that beneficiaries would retain all OM benefits and simply gain additional benefits under MA as a 'fallback plan.' Rarely, if ever, were beneficiaries transparently informed that they had to relinquish their OM to enroll in MA.

213.    Further, United's unsolicited emails convey the impression that the MA recipient will still retain and be entitled to the benefits under OM. With the target of these ads being the elderly, these are deceptive and incorrect. United's emails further create a sense of urgency that can lead to anxiety for the beneficiary, and this tactic is reminiscent of similar MA television commercials.

214.    United further represented to Plaintiff and the Class Members that its MA plans were superior to OM. These representations were made negligently and without reasonable grounds for belief in their truth, demonstrating a careless disregard for the accuracy of their

information.  The MA members  reasonably and justifiably relied on these representations in deciding to enroll in United's MA plans, expecting that their healthcare needs would be met similarly to or better than under OM .

215.   As a direct and proximate result of relying on United's negligent misrepresentations, Plaintiff and the Class Members  suffered harm, including but not limited to, the loss of access to preferred healthcare providers, unexpected medical expenses, and significant disruptions in their healthcare coverage.

<u>**COUNT V**</u>
**INTENTIONAL MISREPRESENTATION**
**Against All Defendants**

216.   Plaintiff and the Class Members re-allege and incorporate by reference the foregoing paragraphs as though fully set forth herein.

217.   United, through its agents and marketing materials, made materially false representations  to Plaintiffs and the Class Members that their MA plans would 'combine' with their OM benefits. However, United failed to disclose that enrollment in MA plans would result in the complete relinquishment of their OM benefits, rendering their government-issued, red, white, and blue OM cards void for further services.

218.   Moreover, United failed to advise the OM beneficiaries that they were fully relinquishing their OM benefits, and that they must not present their government-issued, official  red, white and blue OM  cards for any further services– as it was void.  United's failure resulted in the MA members incorrectly presenting their OM cards for services, which as a result of being void- caused the full balance of services to become the financial responsibility of the MA members.

219.   United further represented to Plaintiff and the Class Members  that the MA plans were superior to OM because United's Ma plan was an enhancement to,  not a replacement of OM. These representations were made intentionally to induce enrollment into their MA plans and without reasonable grounds for belief in their truth.

220.   United either knew that these representations were false or made them recklessly without regard for their truth, demonstrating a willful disregard for the accuracy of information provided to the seniors.  United made these false representations with the intention

of inducing Plaintiff and the Class Members , including Patient 2 and Patient 3, to enroll in their MA plans. Plaintiff and the Class Members justifiably relied on these false representations, believing that they would retain benefits similar to OM .

221.   Patient 3, a 91-year-old female and resident of Orange County, California, dual eligible Medicare-Medicaid beneficiary, began receiving OM benefits on January 1, 1997. She relies on Social Security Income with annual earnings well below $10,-00, incurring no cost-sharing or co-pays under OM, and has availed medical services from any physician and medical facility nationwide since 1997, with full prescription, dental, and vision coverage through Medicaid.

222.   From November 1, 2022 to November 20, 2023, Patient 1 received approximately 25 unsolicited marketing emails from United at her residence in Orange County, as documented in the Appendix. These emails were misleadingly formatted to appear as urgent communications and otherwise official communications from Medicare, or "Medicare Plan Experts."

223.   On December 1, 2022, in response to these misleading emails, Patient 3's family, on her behalf, contacted United at phone number 877-690-1761, engaging in a recorded conversation with representatives "Crystal" and subsequently, licensed sales agent Anthony Tillman, at United's call center.

224.   United's representatives falsely assured that enrollment in their MA plan would not result in the loss of OM benefits and would provide a "fallback" plan, as well as additional benefits such as dental, vision, and hearing coverage, contrary to the limitations and additional costs associated with MA plans.

225.   The false assurances given by United's representatives were in direct contradiction to the actual terms of United's MA plans. In reality, enrolling in an MA plan required beneficiaries to relinquish their OM benefits and subjected them to prior authorization requirements, potential care denials, and limited physician access, none of which were disclosed to Patient 1 or her family during the enrollment process.

226.   These false statements were directly contradicted by the actual terms of United's MA plans, which require beneficiaries to relinquish their OM plan when they sign up for an MA plan, and imposed prior authorization requirements, potential denials of care, and limited physician access, none of which were disclosed to Patient 3 or her family.

227.     As a direct result of these false representations, Patient 3  under the mistaken belief that urgent enrollment in the MA plan was necessary to retain her OM benefits and avoid "penalties", experienced significant panic, confusion, and distress. Her erroneous switch to the United MA plan led to denied claims and financial liability for medical bills totaling $2,482, expenses that would have been fully covered under OM.

228.     As a direct result of this reliance, Plaintiff and the Class Members  suffered harm, including loss of access to preferred healthcare providers, unexpected medical expenses, and disruption in healthcare coverage. There is a direct causal connection between United's intentional misrepresentations and the damages suffered by the Class.

## COUNT VI
## UNJUST ENRICHMENT
### Against All Defendants

229.     Plaintiff and the Class Members re-allege and incorporate by reference the foregoing paragraphs as though fully set forth herein.

230.     United enrolled Plaintiff and the Class Members, including Patients 2 and  3, in its MA plans through deceptive advertising, leading them to believe they would retain their OM benefits alongside additional United MA coverage. This misleading information led beneficiaries to unwittingly replace, rather than supplement, their OM Part A and B plans with United's MA program.

231.     United's actions resulted in its MA members relinquishing their OM benefits, causing them to incur substantial out-of-pocket medical expenses which would have otherwise been covered under OM.

232.     As a direct result of its deceptive practices and subsequent refusal to cover claims under the MA plans, United was unjustly enriched. This enrichment occurred at the expense of MA members who bore the financial burden for medical services that, under fair and honest practices, should have been covered by United.

233.     United MA members including Patient 2 and Patient 3 who each incurred more than $2000 out-of-pocket suffered financial harm due to United's misleading representations and actions.

234.     United retained unjust enrichment by failing to remit payment for the medical

services required for its MA members, as facilitated by its acts of  by providing misleading information through emails, advertisements, and interactions with agents about its MA plans. Patients 2 and 3 after receiving misleading assurances from United, faced unexpected out-of-pocket costs of several thousand dollars for medical expenses due to United's failure to disclose that enrollment in its plan would result in the loss of OM.

235.    This unjust enrichment was a direct result of United's deceptive practices, as they received the financial benefit of not paying for services that they were obligated to cover under the MA plans.

236.    As a result  of United's deceptive business practices, Patient 2 and Patient 3 had medical and surgical services which were fully uncompensated by United, while at the same time the government and thus working taxpayers remitted a fixed monthly fee to United for fully taking care of the medical needs of these patients.

237.    Through its actions, United has received benefits for services from providers to which it was not entitled, leading to unjust enrichment. Defendants' retention of funds that rightfully belong to the patients or their providers, based on the inaccurate portrayal of policy terms and improper denial of valid claims, is inequitable. Restitution is warranted to correct this imbalance.

238.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendants to be permitted to retain benefits received from their misleading representations that United's MA plans combined with OM benefits. These actions, coupled with the subsequent denial of medical payments owed, were conducted in an unfair, unconscionable, and oppressive manner. Retaining such funds under these circumstances constitutes unjust enrichment, making it inequitable for Defendants to keep these ill-gotten  proceeds.

## COUNT VII
### BREACH OF EXPRESS WARRANTY
**Against All Defendants**

239.    Plaintiff and the Class Members re-allege and incorporate by reference the foregoing paragraphs as though fully set forth herein.

240.    United enrolled the Class, including Patients 2 and  3, in MA plans through deceptive advertising, leading them to believe they would retain their OM benefits while

receiving additional MA coverage. In other words, United explicitly misled beneficiaries to believe that enrolling into United MA program would combine, not replace their OM Part A and B plan.

241.     United's actions resulted in Plaintiff and the Class Members relinquishing their OM benefits, causing them to incur substantial out-of-pocket medical expenses which would have otherwise been covered under OM.

242.     On or about November 13, 2023 and additional dates, Defendants sent emails and advertisements  to Plaintiff and Class Members containing specific representations, forming part of United's *Right Plan Promise.*' This communication explicitly committed to assisting beneficiaries in finding the right "Medicare" plan tailored to their needs and budget, constituting an express warranty about the personalized and budget-conscious nature of the plan selection process.

243.     Furthermore, the email as many others prominently advertised 'Exams and care' at '$0' cost. This representation, however, was misleading as the '$0' cost was applicable only to a very narrowly defined range of a few preventive services, contrary to the broad implication of the advertisement. This misleading representation created an express warranty, leading United MA members to erroneously believe that a wider range of medical services would be available at no cost under United's MA plans.

244.     This representation, however, was misleading and constituted an express warranty, as the "$0" cost applied only to a very narrowly defined range of preventive services, contrary to the broad and unqualified implication of the advertisement. Such a representation misled United MA members into believing that a wider range of medical services would be available at no cost under United's MA plans.

245.     Additionally, the emails positioned United as a *'Medicare Plan Expert,'* a representation that was deceptive, aimed at establishing false expertise and trustworthiness in "Medicare", not MA. This claim, effectively an express warranty, served as a marketing tactic to promote United's MA plans, without adequately disclosing their limitations and specific terms.

246.     Additionally, the emails advertise United as a "Medicare Plan Expert," which Plaintiff contends was a deceptive representation aimed at establishing a false sense of expertise and trustworthiness in the context of Medicare plans. In reality, this claim was a marketing

tactic to promote United's own MA plans, without adequately disclosing the limitations and specific terms of those MA plans.

247. By virtue of these representations, which constituted express warranties, Defendants led OM beneficiaries to enroll in United's MA plans under inaccurate pretenses, resulting in MA members incurring unexpected and substantial out-of-pocket medical expenses, which would have otherwise been covered under OM.

248. United breached the express warranties made in their November 13, 2023 email and other similar advertisements, particularly by failing to provide the comprehensive, combined MA and OM coverage as represented. This breach has caused financial harm to Class Members, who incurred unexpected medical expenses that contradicted the advertised terms.

249. As a result of United's deceptive business practices, Patient 2 and Patient 3 had medical and surgical services which were fully uncompensated by United, while at the same time the government remitted a fixed monthly fee to United for taking care of the medical needs of these patients.

## REQUEST FOR INJUNCTIVE AND DECLARATORY RELIEF

250. Plaintiff and the Class Members, pursuant to the Unfair Competition Law (UCL), the Consumers Legal Remedies Act (CLRA), and the False Advertising Law (FAL), hereby request the Court to issue public injunctive relief.

251. This sought relief aims to prohibit United's unlawful practices that pose a threat to the general public. Specifically, this suit seeks an order enjoining United from continuing its deceptive advertising and enrollment practices related to its MA plans. The primary purpose and effect of this relief would be to prevent ongoing and future harm to consumers at large by stopping United's unlawful acts that have been detailed in this complaint.

252. This action also seeks an order that United explicitly disclose in all MA materials that MA enrollment entails fully forfeiting OM Part A and Part B fee for service benefits and renders the government-issued, OM red, white, and blue card fully invalid. Such clear statements and measure will ensure complete transparency for both beneficiaries and providers.

253. Additionally, declaratory judgment is required to clearly define the legal rights and obligations of the parties, particularly in relation to United's practices under these statutes.

The aim of this combined relief is to cease harmful practices immediately and to establish clear legal standards to prevent future harm and protect public interest.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the federal rule of Civil procedure, Plaintiff and the Class Members demand a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class Members pray for the following relief and judgment against United as follows:

**A.** Certifying the Class and appointing Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

**B.** Declaring that United violated its legal obligations in the manner alleged above;

**C.** Permanently enjoining United from engaging in the unlawful, unfair, and fraudulent practices described above;

**D.** Awarding Plaintiff and the Class Members benefits due, plus pre- and post-judgment interest; or ordering United to re-adjudicate the benefit amounts due for Plaintiff and the Class Members' claims and to cause the full amount of benefits owed to be paid, plus pre- and post-judgment interest;

**E.** Ordering United to disgorge any amounts by which it was unjustly enriched through the violations detailed above, to issue restitution for the losses suffered by Plaintiff and the Class Members as a result of such misconduct, to order payment of an appropriate surcharge, and/or other appropriate equitable relief;

**F.** Awarding compensatory damages to Plaintiff and the Class in the sum $495 million for losses and harm sustained as a result of Defendants' unlawful, unfair, and fraudulent business practices;

**G.** As an alternative remedy, ordering United to make an equitable payment to Plaintiff and the  Class Members;

**H.** Awarding Plaintiff and the Class Members disbursements and expenses of this action, including costs of suit and reasonable attorney fees, in amounts to be determined by the Court; and

**I.** Granting such other and further equitable or remedial relief as is just and proper.

Dated: December 1, 2023                    By:    /s/GJuarez

                                                 Gloria Morin Juarez, Esq.
                                                 LAW OFFICES OF GLORIA JUAREZ
                                                 28202 Cabot Road, Suite 300
                                                 Laguna Niguel, CA  92677
                                                 Tel. (949) 288-3402
                                                 Email: gloria@thegjlaw.com
                                                 ATTORNEYS FOR PLAINTIFF

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBITS

**A.** __Exhibit A__: "UnitedHealthcare Insurance Company Agent Agreement", outlines the terms and conditions under which agents are appointed to market and promote United's MA Plans and other health insurance products.

**B.** __Exhibit B:__ https://www.uhc.com/ (Last Accessed on 11/25/2023) showing government issue red, white and blue Original Medicare card, and United Healthcare Medicare Advantage Webpage (Last accessed 11/20/2023)

**C.** __Exhibit C:__ American Hospital Association November 20, 2023 letter to CMS regarding UnitedHealthcare MA plan.

**D.** __Exhibit D:__ National Association of Insurance Commissioners, multi-state letter dated May 5, 2022 to the Senate underscoring Medicare Advantage advertising deception.

**E.** __Exhibit E:__ Exemplar physician letter dated July 21, 2023 to United patients underscoring United's unfair payment practices and termination of all United contracts.

**F.** __Exhibit F:__ Exemplar media coverage dated September 25, 2023 outlining hospitals and healthcare systems nationwide terminating all contracts with United Medicare Advantage plans, citing United's unfair payment practices and improper claim delay and denial tactics.